IN THE UNITED STATES DISTRICT COURT OF PENNSYLVANIA
WESTERN DISTRICT

C.A.  05-92  ERIE

JAMES HARRY HODSON, III,
Petitioner

v.

MARILYN BROOKS,
Respondent

PETITIONER'S REPLY BRIEF

James H. Hodson, III
# EL-3079
301 Morea Road
Frackville, Pennsylvania
17932

-i-

## TABLE OF CONTENTS

TABLE OF CITATIONS ...................................................... ii

I.   STATEMENT OF CASE

   A.   Procedural History ............................................ 1

   B.   Statement of Facts ............................................ 4

II.  ARGUMENT

   A.   The Petition for Writ of Habeas Corpus was timely filed ....... 7

   B.   The Petition should be reviewed by this Honorable Court because Petitioner has exhausted all of his state court remedies....... 7

   C.   Petitioner was denied the effective assistance of counsel as guaranteed by the Sixth Amendment of the Unites States Constitution................................................... 8

   D.   Petitioner's Fifth Amendment Constitutional rights were violated when he gave his incriminating statement to the investigating police officer without being advised of his Miranda Warnings ............................................ 11

   E.   Petitioner's incriminating statement, while being in a custodial setting, was illegally obtained, involuntary and improperly admitted into evidence ............................ 13

III.   PRECISE RELIEF REQUESTED ........................................ 16

## TABLE OF CITATIONS

CASES

Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326 ............. 13

Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619 ......................... 14

Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445 ...................... 15

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 .................... 12

Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711 .................... 13

Picard v. Conner, 404 U.S. 270, 92 S.Ct. 509 ....................... 7

Rhode Island v. Innis, 466 U.S. 291, 100 S.Ct. 1682 ................ 13,14

Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041 ............. 14

Stokes v. District Attorney, 247 F3d 539 ........................... 7

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 ............. 8

Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 .................... 12

United States v. Berkemer, 486 U.S. 420, 104 S.Ct. 3138 ............ 12

United States v. Fisher, 215 F. Supp. 2d. 1212 ..................... 14

United States v. Perdue, 8 F3d 1455 ................................ 12

United States v. Robertson, 19 F3d 1318 ........................... 14

Williams v. Taylor, 529 U.S. 420, 120 S.Ct. 1479 .................. 10

-1-

## PROCEDURAL HISTORY

Petitioner was charged with Rape, two counts of Deviate Sexual Intercourse, Sexual Assault, and Simple Assault, offenses which the petitioner is alleged to have committed during the weekend of June 18 to June 20, 1999.

On May 15, 2000, the criminal information was amended to change the "To Wit" Section of Count V, Involuntary Deviate Sexual Intercourse. It now read, " The Defendant did, on or about June 18 to 20, 1999, by forcible compulsion, forced Lynne A. DeVore to submit to cunnilingus by the defendant at her residence at 366½ North Street in the City of Meadville, Crawford County, Pennsylvania."

A jury found the Petitioner not guilty of Rape, Sexual Assault, and one count of Involuntary Deviate Sexual Intercourse (felatio).

However, the jury did find the Petitioner guilty of Simple Assault, 18 Pa. C.S.A. § 2701(a), and amended charge of Involuntary Deviate Sexual Intercourse (Cunnilingus) 18 Pa. C.S.A. § 3123(a).

On July 26, 2000, the petitioner was sentenced to pay a fine of $100.00 for the Simple Assault charge, fined $100.00 and to undergo imprisonment for a minimum period of four (4) years and a maximum of eight (8) years on the Involuntary Deviate Sexual Intercourse conviction.

Petitioner filed a timely post sentence motion which was ultimately denied by the court on September 27, 2000. No direct appeal was taken. Instead, on November 2, 2000, Petitioner filed a Motion for Post Conviction Collateral Relief.

On April 9, 2001, the Court of Common Pleas of Crawford County granted the petitioner the right to take a direct appeal, nunc pro tunc. Petitioner's other issues were not addressed.

Petitioner took appeal to the Superior Court on April 10, 2001, at No. 663 WDA 2001.

The following issues were raised on that appeal:

> 1. Whether the trial court erred in allowing the prosecution to amend the "To Wit" Section of Count V – Involuntary Deviate Sexual Intercourse, after the jury had been selected;

    2.  Whether Petitioner's trial counsel rendered ineffective
assistance of counsel by failing to file a motion to suppress
his statement made to police;

    3.  Whether Petitioner's trial counsel rendered ineffective
assistance of counsel by failing to request a mistrial when the
prosecutor referred to trial counsel as "Mr. Public
Defender" in his opening statement;

    4.  Whether Petitioner's trial counsel rendered ineffective
assistance of counsel by failing to impeach the victim's
credibility due to her deteriorated mental condition and due to
her alcohol and drug induced intoxication condition at the
time of the alleged incident

By Memorandum and Order dated December 18, 2001, the Superior Court of
Pennsylvania denied petitioner's appeal and affirmed the judgment of
sentence.

The Superior Court found that the "amendment did not add any new
elements to the original charges, the trial court did not err by amending
the criminal information." They also stated that "appellant fails to prove
that prejudice resulted in regards to any of his ineffective claims"... "For
example, appellant argues that trial counsel was ineffective for failing to
file a motion to suppress his statement to the police. Appellant claims
that he was intoxicated, that it was his intention to remain silent and he
asked for an attorney, but the police pressured him into making a
statement. Even if these events did occur, appellant does not draw this
Court's attention to any evidence that prejudice resulted from the admission
of this statement. Since there is no showing of prejudice, appellant's
claim fails."

A Petition for Allowance of Appeal in the Supreme Court of Pennsylvania
was denied on May 31, 2002, at 22 WAL 2002.

Petitioner filed a second pro se motion for Post Conviction Collateral
Relief on September 27, 2002. The amended motion for Post Conviction
Collateral Relief was filed on January 17, 2003.

There were approximately seventeen (17) issues raised in Petitioner's
initial pro se motion. Among those, petitioner raised the following issue:

    1.  Whether direct appellate counsel was ineffective for "failing

-3-

> to adequately raise and argue whether trial counsel rendered ineffective assistance of counsel by failing to file a motion to suppress petitioner's statement to police."

In honorable Judge Gordon R. Miller's Memorandum and Order of April 2, 2003, the court ruled that this particular issue had been "previously litigated" and dismissed the claim.

An evidentiary hearing was held on June 2, 2003, to discuss petitioner's other claims.

By Memorandum and Order dated October 1, 2003, the Court of Common Pleas denied petitioner's motion for Post Conviction Collateral Relief.

Petitioner filed a Notice O appeal to the Superior Court on October 31, 2003. The Superior Court affirmed the judgment of the lower court and denied the motion for Post Conviction Collateral Relief on September 8, 2004, at 1919 WDA 2003.

Petitioner's Petition for Writ of Habeas Corpus was filed and received by the Clerk of Court on March 22, 2005.

-4-

## STATEMENT OF FACTS

On Monday, June 21, 1999, Petitioner, Hodson, received a phone call around 1:00 am. The caller identified himself as Officer Trenga of the Meadville Police Department.

Trenga asked if Hodson could come down to the police department to speak with him. Hodson asked, "Is this about Lynne and the pills?" At that point, Hodson's phone disconnected.

Approximately five minutes later, Hodson heard a knock at his door. Standing at his door stood Officer Trenga and Officer Gump.

Trenga asked if Hodson would come to the police station to speak with him. Hodson told Trenga that he had to be at work early. Trenga told Hodson that it was important and that it would be brief. Hodson told Trenga that he had been drinking and could not drive. Trenga said that that was okay, he would take him to the station.

Hodson reluctantly agreed, and they transported him to the station. When they arrived, Trenga escorted Hodson to a small office. Trenga did not inform Hodson that he was under investigation for a crime, nor did he inform Hodson as to what that crime was.

Officer Trenga then produced a small tape recorder and began taping their conversation.

Trenga began to ask about the relationship that Hodson had with the alleged Victim, DeVore, his ex-girlfriend.

Throughout the interview, Trenga asked about the sexual relationship that Hodson had with DeVore. Specifically, around the time of the alleged assault.

-5-

Hodson was confused about this line of questioning. (See Petitioner's Exhibit: 1 [page 357 of Trial Transcript]).  He assumed that he was there to speak about the overdose of pills that DeVore consumed the night before – June 19, 1999.

When Hodson realized that Trenga was questioning him about forcing sex upon DeVore, he told Trenga that he was not going to answer anymore of his sex questions. (See Petitioner's Exhibit: 2(A), 2(B), [page 199, 200 of Trial Transcript];  Exhibit: 3 [page 12 of Transcribed Tape Interview]).

Shortly thereafter, Hodson asked if Trenga could turn the tape recorder off.  Hodson then said that maybe he should speak with an attorney.  Trenga then escorted Hodson back to his apartment.

On August 18, 1999, the police filed their criminal complaint against Hodsom on charges of Rape, Sexual Assault, Simple Assault, and two counts of Involuntary Deviate Sexual Intercourse.  He was held in prison in lieu of $25,000 bond.

Hodson retained Edward J. Hatheway, Esq. as counsel.

On October 22, 1999, Hatheway withdrew as counsel due to a presumed conflict of interest.

Hodson posted bail and was released from jail on November 8, 1999, at which time he secured Ross Prather, Esq. from the Public Defender's Office, as counsel.

Prior to trial, Hodson informed Prather that he was intoxicated and under the influence of drugs during the time he made his incriminating statement to the police, and that he was never read his Miranda Rights. (See Petitioner's Exhibit: 4)

Prather did not investigate this issue, and in turn, did not request a

-6-

suppression hearing to preclude Hodson's incriminating statement from being entered into evidence.

Hodson's actual statements were somewhat equivocal to the effect that he had "in a sense" somewhat forced himself upon DeVore in that, insofar as acts of cunnilingus he would go down on her despite her initial protestations and she would give in. (See Petitioner's Exhibit: 5 [page 10 of Transcribed Tape Interview]).

Due to the fact that Hodson did give this incriminating statement to police, Prather advised Hodson to testify before the jury to explain why he said the things he did to the investigating police officer.

On May 15, 2000, the jury trial commenced.

On May 17, 2000, the jury returned with the verdicts of Not Guilty on the charges of Rape, Sexual Assault and Involuntary Deviate Sexual Intercourse (felatio), and Guilty of Simple Assault and count V, Involuntary Deviate Sexual Intercourse (Cunnilingus).

After filing his pro se Post Conviction Relief Motion, Hodson was once again appointed Edward J. Hatheway, Esq. as his appellate counsel, even after Hatheway had previously dismissed himself from representation on Hodson's behalf due to a conflict of interest.

Hodson explained to Hatheway that he was never read his Miranda Rights and that he was in a "custodial setting" to warrant a reading of these rights.

Hatheway never investigated this issue.  Otherwise, he would have discovered that there was never a signed waiver of Hodson's Miranda Rights, as the police report had suggested (See Petitioner's Exhibit:8)

On Direct appeal, Hatheway failed to adequately raise and argue Hodson's Fifth Amendment violations, and as a result, Hodson's claim failed.

-7-

## ARGUMENT

A.   The Petition for Writ of Habeas Corpus was timely filed.

A habeas petitioner who has litigated a post conviction petition in state court may delay the filing of his habeas petition for the period of time that the post conviction petition was actually pending in state court. Moreover, the courts have consistently ruled that, as opposed to a direct appeal, the time at which a post conviction petition has been finally decided is the end of proceedings in state court.  Stokes v. District Attorney, 247 F3d 539.

In the instant case, on May 31, 2002, the Supreme Court of Pennsylvania denied Hodson's Petition for Allowance of (Direct) Appeal.  On September 27, 2002, Hodson filed a pro se Post Conviction Relief Motion approximately four (4) months after the finality of his direct appeal.  Hodson's Post Conviction Relief Motion became final on September 8, 2004.  His Petition for Writ of Habeas Corpus was filed with the Clerk of Court on March 22, 2005, well within the one year statute of limitations.

B. The Petition should be reviewed by this Honorable Court because petitioner has exhausted all of his state court remedies.

Federal habeas relief is available only where the petitioner has exhausted all available state remedies by presenting the federal issues in the state courts.  Picard v. Conner, 404 U.S. 270, 92 S.Ct. 509.

In this case, Hodson is again filing a claim of Ineffective Assistance

-8-

of Counsel.

On direct appeal, Hodson first raised the issue of ineffective assistance of Trial Counsel for failing to file a motion to suppress his incriminating statement made to police at 663 WDA 2001.  The claim failed.

In his pro se Post Conviction Relief Motion, Hodson attempted to raise the claim of ineffective assistance of appellate counsel for failing to adequately raise and argue that trial counsel was ineffective for failing to file a motion to suppress his incriminating statement made to police.  (See Petitioner's Exhibit: 6)  This claim was deemed "previously litigated" and summarily dismissed.  (See Petitioner's Exhibit: 7 [page 10 of Honorable Judge Gordon R. Miller's Memorandum and Order of April 2, 2003]).

Therefore, Hodson has fairly presented his federal claims of ineffective assistance of counsel in the state courts.


　　　　C.　Petitioner was denied the effective assistance of counsel as
　　　　　　guaranteed by the Sixth Amendment of the United States
　　　　　　Constitution.


In order to succeed on this claim, Hodson must first satisfy the two-part test of Ineffective Assistance of Counsel set forth by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052.

The first prong of the <u>Strickland</u> test requires Hodson show that his counsel's error were so egregious as to fall below an "objective standard of reasonableness."

-9-

Under the second prong of <u>Strickland</u>, Hodson must demonstrate that he was actually prejudiced by counsel's errors, meaning that, but for counsel's faulty performance, the outcome of the proceedings would have been different. Prejudice also includes a showing that counsel's errors deprived Hodson of a fair or reliable trial.

Hodson maintains that his trial counsel rendered ineffective assistance of counsel for failing to file a motion to suppress his incriminating statement made to police.

Hodson told trial counsel, Ross Prather, Esq. on numerous occasions that he was never read his Miranda Rights prior to giving his incriminating statement. (See Petitioner's Exhibit: 4)

Prather referred to the initial police report and told Hodson that his Miranda Rights were in fact read to him, and that his statement might not hurt him, but that it might actually help him.

If Prather was to investigate Hodson's claims of Miranda violations, he would have discovered that the investigating officer states in his police report that Hodson was read "his Miranda Rights in which he understood and signed a waiver." (See Petitioner's Exhibit: 8), however, a waiver of these Miranda Rights was never produced prior to trial.

Due to the fact that the respondent cannot produce a signed waiver of Hodson's Miranda warnings, this bolsters Hodson's claim that he did not receive his Miranda warnings as the investigating officer states in his initial police report and in which the District Attorney of Crawford County suggests in the Respondent's Brief.

-10-

Because Hodson's incriminating statement was entered into evidence, this placed Hodson into a situation where he had to testify before a jury about a crime that he was not only innocent of, but completely unaware of from the onset.

When Hodson testified at trial on direct examination, cross examination, and redirect examination, he was made to answer questions concerning his incriminating statement made to police about performing cunnilingus upon the alleged victim - his ex-girlfriend.

Hodson strongly believes that the jury's decision was heavily influenced by Hodson's incriminating statement and testimony concerning the same was detrimental and prejudicial to the outcome.

Prather's decision not to request a suppression hearing to exclude Hodson's statement from being entered into evidence was not part of a reasonable, tactical, or strategic decision.

Hodson also submits that his appellate counsel, Edward J. Hatheway, Esq. rendered ineffective assistance of counsel for failing to adequately raise and argue on direct appeal whether trial counsel was ineffective for failing to file a motion to suppress his statement made to police.

Hodson relies heavily on the opinion of the Court in <u>Williams v. Taylor</u>, 529 U.S. 420, 120 S.Ct. 1479.

A petitioner is entitled to a federal evidentiary hearing on claims that were not fully factually developed in state court, where, despite "due diligence", he failed to develop the facts. A prisoner must be diligent in trying to develop the record and presenting, if possible, all claims of constitutional error. Yet, comity is not served by saying a prisoner "has

-11-

failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite due diligent effort.  In that circumstance, an evidentiary hearing is not barred.  Federal habeas courts should find "diligence" where reasonable steps were taken to bring the facts to light in state court.  <u>Williams v. Taylor</u>, ~~supra~~.

Here, appellate counsel, Hatheway failed to develop the facts to support Hodson's claim that trial counsel failed to file a motion to suppress his incriminating statement made to police.

Hodson told Hatheway that he was never read his Miranda warnings prior to giving his statement to police.  Hatheway made no effort to investigate Hodson's claim.  Had he done so, he would have discovered that a waiver of Hodson's Miranda Rights was never produced.

The lackluster way in which Hatheway presented Hodson's claim on direct appeal falls well below an objective standard of reasonableness.

Hodson attempted to "bring these facts to light" in his pro se, Post Conviction Relief Motion of September 27, 2002, however, the Post Conviction Court summarily dismissed this claim. (See Petitioner's Exhibit: 7)

Hodson submits that if appellate counsel had made a proper challenge concerning his Fifth Amendment violations on direct appeal, he may have been granted a new trial.

Hatheway's failure to adequately raise and argue Hodson's Fifth Amendment violations on direct appeal was not a tactical or strategic decision.

D.  Petitioner's Fifth Amendment Constitutional rights were

-12-

> violated when he gave his incriminating statement to the
> investigating police officer without being advised of
> his Miranda Warnings.

Miranda requires that procedural safeguards be administered to a
criminal suspect prior to "custodial investigation."  Thus, two requirements
must be met before Miranda is applicable; the suspect must be in "custody",
and the questioning meet the legal definition of "interrogation."  United
States v. Perdue, 8 F3d 1455.

The Supreme Court has instructed that a person has been taken into
police custody whenever he "has been deprived of freedom of action in a
significant way."  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602.

The only relevant inquiry is "how a reasonable man in the suspect's
position would have understood his situation."  United States v. Berkemer,
486 U.S. 420, 104 S.Ct. 3138.

Two separate inquiries are necessary to determine whether defendant was
"in custody" when making his statement:  First, what were the circumstances
surrounding the interrogation; and second, given those circumstances, would
a reasonable person have felt he or she was not at liberty to terminate the
interrogation and leave.  Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457.

In this case, Hodson did not feel he was at liberty to terminate the
interview and leave.  Hodson asked permission to have the recorder turned
off as opposed to demanding that the interview be terminated.  Further,
because Hodson was persuaded, upon the officer's insistence, to accompany
them to the station, where he rode in the back seat of the squad car, Hodson

-13-

did not believe he was able to leave freely on his own accord.

It would have been more convenient for Hodson to drive himself to speak with the officer at the station, however, the officers persuaded him to ride with them, due to his intoxicated state of mind.

Hodson would have preferred to drive himself, but he made it known to the officers that he was intoxicated and could not drive.

The second requirement of Miranda requires that the suspect must have been subjected to "interrogation." The court has held that interrogation includes "any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 466 U.S. 291, 100 S.Ct. 1682.

In this case, Trenga does use words to elicit an incriminating response from Hodson. (See Petitioner's Transcribed Tape Interview, generally)

>    E.  Petitioner's incriminating statement, while in a custodial
>        setting was illegally obtained, involuntarily and improperly
>        admitted into evidence.

Any person subject to custodial interrogation is constitutionally entitled to receive Miranda Rights, and a failure to receive these rights makes any subsequent statement, per se, inadmissible. Dikerson v. United States, 530 U.S. 428, 120 S.Ct. 2326.

"Custodial Interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711.

-14-

"Incriminating response" is defined as "any response - whether inculpatory or exculpatory - that the prosecution may seek to introduce at trial." <u>Rhode Island v. Innis</u>, 466 at 301, 100 S.Ct. 1692.

Whether a defendant's incriminating statements were made voluntarily must be assessed from the totality of the circumstances, looking both at the characteristics of the defendant and the details of the interrogation. In essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was over borne. <u>United States v. Fisher</u>, 215 F.Supp. 2d 1212.

This also includes considerations of "the youth of the accused, his lack of education, low intelligence, **the lack of any advice to the accused of his constitutional rights**, length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 93 S.Ct. 2041 (emphasis added).

Coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Coercion may include situations where "the police somehow overreach by exploiting a weakness or condition known to exist." <u>United States v. Robertson</u>, 19 F3d 1318.

Moreover, "when a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear cut determination that the confession was in fact voluntarily rendered. Thus, the Prosecution must prove, at least by preponderance of the evidence, that the confession was voluntary." <u>Lego v. Twomey</u>, 404

-15-

U.S. 477, 92 S.Ct. 619.

The ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the constitution is a matter for independent federal determination... Voluntariness of a confession is a legal question meriting independent consideration in a Federal Habeas Corpus proceeding. <u>Miller v. Fenton</u>, 106 S.Ct. 455.

In this case, Hodson was not informed of the true nature of the circumstances surrounding the purpose of the questioning. Had he known, he would not have voluntarily participated or provided information in the interview without an attorney present.

Hodson maintains that he was under the influence of drugs and alcohol, which added to his confusion during the interview, and the police exploited this to coerce a confession of guilt to a crime which he did not commit and of which he was entirely innocent.

Honorable Judge Gordon Miller, who presided over this case, writes in his Memorandum and Order dated October 1, 2003, a number of times that the defendant admits to performing cunnilingus upon the victim. (See Petitioner's Exhibit: 9,10), and in Judge Miller's conclusion of his memorandum and Order, it shows just how damaging Hodson's incriminating statement was in the jury's decision to convict him. (See Petitioner's Exhibit: 11).

Due to the fact that Hodson's trial attorney never requested a suppression hearing of his statement, there was no reliable determination that the confession was in fact voluntarily rendered.

-16-

Again, because of Hodson's incriminating statement made to police, which was introduced at trial, the only sex crime that Hodson was convicted of committing upon his ex-girlfriend was involuntary deviate sexual intercourse (cunnilingus).  According to Judge Miller's conclusion of his Memorandum and Order, this shows just how damaging and prejudicial Hodson's statement was.

### PRECISE RELIEF REQUESTED

For the above-stated reasons, Hodson respectfully prays that this Honorable Court hold an evidentiary hearing to determine whether Hodson's statement was voluntarily rendered.  Upon a favorable decision in the evidentiary hearing, Hodson requests that this Honorable Court order the suppression of his incriminating statement, vacate the judgment of sentence of July 26, 2000, and award the defendant a new trial and a reinstatement of his bond.

Respectfully submitted

*James H. Hodson III*
James H. Hodson, III, pro se

Petitioner's Exhibit: 1

357

```
1          A.      I was --

2          Q.      -- on June 21st and why the answer is

3     yes today?

4          A.      I was very confused that weekend about

5     why I was there at the police station speaking to this

6     officer.

7          Q.      You were confused?

8          A.      Yes, I was.  It was not mentioned to me

9     why I was there -- what I was there for and why I was

10    there to speak about things.

11         Q.      So you're saying Patrolman Trenga never

12    informed you of the purpose of the investigation?

13         A.      No, not at all.

14         Q.      Okay.

15         A.      I just assumed it was Lynn and the

16    pills.

17         Q.      Okay.  Don't answer a question that is

18    not asked.  Okay.  You're in the apartment.  Now, what

19    is -- what is the next -- I forgot where I was.

20         A.      I -- I do believe you were talking

21    about the stairs.

22         Q.      I appreciate that.  She's in from the

23    stairs now and she's in the apartment and you're in

24    there what happens after that?

25         A.      I -- well, we started to walk over
```

1       I don't and you're talking about things that I

2       want to hear a little more about calmly.  So

3       let's take the officer and the court reporter

4       and the attorneys in chambers and if it's going

5       to be more than about 5 minutes, I'll send you

6       upstairs where you can relax.  You can stretch,

7       relax, and we will come back.

8  IN CHAMBERS

9                   THE WITNESS:  I was corrected, Your

10      Honor.

11                  THE COURT:  Okay.

12                  MR. SCHWARZ:  Are we on the record?

13      At one point and time in his transcript he

14      indicates that I don't want to answer any more

15      of your sex questions.  We absolutely -- we

16      positively can't get into that.  At that point

17      he is invoking his 5th Amendment Right on that

18      subject.  I just wanted to make sure I didn't

19      get the wrong question and get the wrong answer.

20                  MR. PRATHER:  I agree with that

21      instruction.

22                  THE COURT:  Well, he -- was he

23      -- was he given his Miranda Rights at the

24      outset?

25                  THE WITNESS:  Yes, before I even

                MELISSA L. HOFFMAN
          REGISTERED PROFESSIONAL REPORTER

1 started the tape recording.

2    THE COURT:  Okay.  And at some

3 point, he said don't ask me any more questions?

4    THE WITNESS:  Sex questions.

5    MR. PRATHER:  No.

6    MR. SCHWARZ:  No.

7    THE COURT:  Any more sex questions?

8    MR. SCHWARZ:  He said specifically

9 I won't answer any more of your sex questions.

10    THE COURT:  Well, you can't say

11 that.

12    THE WITNESS:  Excuse me?

13    THE COURT:  You cannot say he said

14 -- you cannot any longer ask me any more sex

15 questions.

16    THE WITNESS:  Okay.

17    THE COURT:  He has got a

18 Constitutional Right to remain silent and when

19 he invokes that No. 1, you got to honor it.  No.

20 2, the jury can't hear it because they may hold

21 it against him that he refused to answer

22 questions.  He has got a right to refuse to

23 answer questions.  Anything else on this?  We

24 want to be clear.

25    MR. SCHWARZ:  That's fine.

     MELISSA L. HOFFMAN
   REGISTERED PROFESSIONAL REPORTER

Petitioners Exhibit: 3

HODSON: Yeah, he had showed up around 10 o'clock.

TRENGA: Where does he sleep at?

HODSON: He sleeps in... two rooms down from there.

TRENGA:  Is there a separate bedroom for him?

HODSON: Yeah.

TRENGA: But it's in her same apartment?

HODSON: Yeah.

TRENGA: He showed up around ten?

HODSON: Yeah.

TRENGA: You guys were both up?

HODSON: All three of us were.

TRENGA: Were you guys in the same room with each other at one point?

HODSON:  At one point in time, yeah.  And then she came back and said, well, my brother's crying, he's very depressed in there you know,  I feel bad for him, you know his friend just died, you know, that's terrible, you know, but he was really depressed *himself and* ~~crying, you know~~

TRENGA: Ah, did you guys have sex at all while he was there?

HODSON: I'm not going to answer anymore of your sex questions (laughing)

TRENGA: No?

HODSON: No.

TRENGA: Okay.  Let's go to Saturday.

HODSON: Okay.

TRENGA: Woke up Saturday, um, about what time did you wake up? She had a... what'd she have to go to, she have a appointment Saturday?



ROSS C. PRATHER
*Chief Public Defender*

—

BRUCE A. BARRETT
*First Assistant Public Defender*

—

JOHN FURNO
*Special Investigator*

# OFFICE OF PUBLIC DEFENDER
## CRAWFORD COUNTY, PENNSYLVANIA

Crawford County Courthouse
Meadville, Pennsylvania 16335
Telephone: (814) 333-7367
Toll Free in PA: (800) 982-9019 Ext. 367

M. DAN MASON
*Assistant Public Defender*

—

STEPHEN E. HALL
*Assistant Public Defender*

—

BRIAN V. GORMAN
*Assistant Public Defender*

October 18, 2000

Mr. James Hodson
Crawford County Correctional Facility
2100 Independence Drive
Saegertown, PA 16433

Dear James:

I received your letter on October 17, 2000. With regard to your wish to file a direct appeal, I do not see any issues upon which to appeal. To file a direct appeal, we must appeal upon a particular point of law which was violated during your proceedings or trial. I cannot identify any, beyond those available through PCRA. You have mentioned in the past that you did not receive your Miranda Rights. That also would be an issue which would be addressed not on direct appeal, but within a PCRA Petition.

One particular legal issue which I do not think you should overlook is the point at the very beginning of the trial at which Mr. Schwarz addressed the forum by saying: "may it please the Court, ladies and gentlemen of the jury, and *Mr. Public Defender*." At that point, of course, I registered an objection, and approached the bench. I cannot remember entirely, but I may have asked the Judge for a very limited instruction. I did not want you to be prejudiced by the fact that you were employing a Public Defender, but at the same time I did not want to emphasize the fact any further. Conceivably, a motion for mistrial could have been requested at that time. I did not ask for a mistrial. If you feel that a mistrial should have been asked for at that time, then that is something you should also include in your PCRA Petition. Personally, I think it would be your strongest point, and therefore I do not want you to overlook it. Remember that your position on this point is significantly bolstered by the fact that i instructed Eric Schwarz not one minute earlier not to say that. He clearly was not only playing games in the courtroom, but purposefully seeking to prejudice the jury for your lack of assets or income.

At the point that you file your PCRA, you will be appointed a new Crawford County attorney. He should then seek Discovery in the conventional manner.

I again wish you luck, and remain,

Very Truly Yours,

OFFICE OF PUBLIC DEFENDER

Ross C. Prather, Esq.
Chief Public Defender

RCP/lsb

HODSON:  Yeah.  And I don't think she wanted to be with me at that certain point of time.

TRENGA:  How

HODSON:  I see basically what you're trying to get at here.

TRENGA:  Well

HODSON:  (laughing)

TRENGA:  You were upset

HODSON:  I could, yeah, I could tell what you're trying to get at, I mean, that's, that's not really hard for me

TRENGA:  You're telling me you were upset, but you still wanted to have sex with her?

HODSON:  Yeah.

TRENGA:  You think you might have forced it on her?

HODSON:  In a sense, yeah.

TRENGA:  But did she ever tell you no, or stop.

HODSON:  She goes, well, she actually would say I don't want you to and then I would go down on her.

TRENGA:  Meaning you would go between her legs and have oral sex?

HODSON:  Yeah.

TRENGA:  Okay.

HODSON:  And then it just evolved from there.

TRENGA:  And then like, she almost.... she gave in?

HODSON:  Basically.  Yeah.

TRENGA:  Okay. Um, where'd her brother come in to play? You said, you stated earlier that he was at her apartment?

-10-

Petitioner's Exhibit: 6

**5. THE FACTS IN SUPPORT OF THE ALLEGED ERROR(S) UPON WHICH THIS MOTION IS BASED ARE AS FOLLOWS:** (State facts clearly and fully; argument, citations, or discussions of authorities shall not be included.)

(A) I know the following facts to be true of my own personal knowledge:

Direct appellant counsel was ineffective with respect to the following issues:

1.) Failing to adequately raise and argue whether trial counsel rendered ineffective assistance of counsel by a.) Failing to file a motion to suppress petitioner's statement to the police b.) Failing to impeach the victim's credibility due to her alcohol and prescription drug intoxication condition at the time of the incident, on direct appeal, and her deteriorated mental condition

2.) Failing to raise a sufficiency of evidence, and mistake of fact jury instruction, as requested by petitioner.

(B) The following facts were made known to me by means other than my own personal knowledge (Explain how and by whom you are informed):

SCI - Mahanoy Law Library

(C) In the event my appeal is allowed as requested under #4, the following are the matters which I intend to assert on that appeal (Specify the matters to be asserted if appeal is allowed)

Petitioner's Exhibit: 7

It is clear that we should consider only the amended petition but, in this case, we will consider the allegations the defendant raised, pro se, in his second filing as well as the five (5) allegations of error raised in his counseled amended petition.

The defendant is not eligible for post conviction collateral relief if any allegations of error has been previously litigated. For these purposes an issue has been previously litigated if: (1) the highest appellate court in which the defendant could have review as a matter of right has ruled on the merits of the issue; or (2) if the matter has been raised and decided in a proceeding collaterally attacking the conviction or sentence. (42 Pa.C.S.A. 9544).

Furthermore, defendant may not obtain PCRA relief to relitigate a previously litigated claim under the guise of ineffective assistance of counsel or by "presenting new theories of relief to support previously litigated claims." Commonwealth v. Christy, 540 Pa. 192, 656 A.2d 877, 881 (1995).

The following claims that are set forth in the defendant's pro se latest petition had been previously litigated and will not be considered by us now:

1.     Failure of counsel to file a motion to suppress defendant's statement to the police[2] (latest pro se petition, par 5(A) 1).

2.     Failure of counsel to impeach the victim's credibility due to her deteriorated mental condition and due to her alcohol and prescription drug intoxication at the time of the incident. (latest pro se petition par. 5 (A) 1).

3.     Failure of counsel to argue that the Commonwealth did not provide the defendant with formal written notice with respect to Count 5, involuntary deviate sexual intercourse. (latest pro se petition par 5(A) 2).

All of these items have been decided by the Superior Court, and became final thirty (30) days after the Supreme Court denied allocatur.

**_Are there matters that could be decided without an evidentiary hearing?_**

---

[2]      If the current petition is deemed to be a second petition this question does not meet the Lawson, supra. test. Commonwealth v. Dukeman, 413 Pa. Super. 397, 605 A.2d 418, 421 (1992).

Se--e---e: 28   INCIDENT SUPPLEMENTAL REPORT   Page No.  1
08/10/99

#99-005219 DEVORE REPORTS THAT FOR 3 DAYS SHE WAS HELD AT WILL & RAPED

Reported by: VINCENT TRENGA              Date reported: 06/21/99
Reviewed by: BONNIE VAN NORT             Date reviewed: 06/21/99

ON THE ABOVE DATE AT APPROX. 0100 HOURS THIS OFFICER ALONG WITH OFFICER GUMP WENT TO HODSON'S RESIDENCE AT 723 TERRACE ST. APT. 3A.   JUST PRIOR TO THIS I CONTACTED HODSON BY PHONE AND ASKED HIM IF HE WOULD COME TO THE STATION SO I COULD TALK TO HIM.   HE THEN ASKED "IS THIS ABOUT LYNNE AND THE PILL'S" AND THEN THE PHONE DISCONNECTED.

UPON ARRIVAL AT HODSON'S HE SAID HE WANTED TO GO TO BED AND I TOLD HIM THAT IT WAS IMPORTANT THAT I TALK TO HIM AND THAT I WOULD BE BRIEF.   HODSON THEN AGREED AND WE TRANSPORTED HIM TO THE STATION.

I FIRST MADE IT CLEAR TO HODSON THAT HE WAS NOT UNDER ARREST BUT STILL HAD TO READ HIM HIS RIGHT'S IN WHICH HE UNDERSTOOD AND SIGNED THE WAIVER.

AT THIS TIME I CONDUCTED A TAPED INTERVIEW, SEE TRANSCRIPT FOR DETAILS.

HODSON STATED THAT HE DID NOT WANT TO TALK TO ME ANY MORE AND THAT HE WOULD TALK TO THE DETECTIVE AT A LATER DATE WITH AN ATTORNEY.   WHILE RECORDER WAS SHUT OFF HE STATED THAT HE WISH HE WOULDNT OF SOME WHAT HE DID WITHOUT GOING INTO DETAILS AND BIENG ELUSIVE ABOUT WHAT HE DID AND THAT HE DIDNT TRUST HIMSELF AROUND HER.   HODSON SHOWED ME SOME SCRATCH MARKS ON THE RIGHT SIDE OF HIS BELLY HE SAID HE GOT FROM DEVORE.   HE STAED SHE SCRATCHED HIM WHEN THEY WERE FIGHTING WITH EACHOTHER.   HE WOULD NOT LET ME TAKE PICTURES OF THE SCRATCHES STATING THAT THEY COULD BE USED AGAINST HIM IN A COURT OF LAW.

THIS OFFICER THEN TRANSPORTED HODSON BACK TO HIS RESIDENCE.

Petitioner's Exhibit: 8

MEADVILLE CITY POLICE DEPARTMENT

Petitioners Exhibit: 9

accounts the defendant surprised the victim when he confronted her in that stairway without a prior invitation. The victim testified that she was afraid of the defendant but yet she did not seek help from the man who was leaving her off nor did she leave with that man to seek a safe haven.

Throughout the weekend the defendant and victim were in and out of bed. The victim had numerous opportunities to seek help or to leave. There was a time when the defendant left the apartment so the victim was free to get help or leave. At times during the weekend the victim's brother, who lived in a space nearby, was present and could have been contacted. The funeral for the deceased friend had been scheduled for Saturday and the victim had a legitimate excuse to leave the apartment and escape the defendant by going to the funeral.

The defendant admitted that he did perform oral sex on the victim. Since the jury acquitted the defendant of the rape and IDSI (fellatio) counts and since he admitted to committing simple assault on the victim, the only issue on the remaining IDSI (cunnilingus) count is whether or not the act of cunnilingus, admitted to by the defendant, was with or without the victim's consent. It is against this background that we must view this claim as to whether or not trial counsel rendered ineffective assistance by bringing up the prior rape, and by not seeking a limiting instruction.

Was evidence of the prior rape evidence of a prior bad act? The answer is undeniably yes. As it turns out, however, we cannot find that trial counsel was ineffective in bringing the matter up, and in not requesting a cautionary instruction.

The defense strategy was, inter alia, to show how ridiculous the victim's testimony was with respect to her fear of the defendant and to show, directly and circumstantially, that the victim consented to the weekend of sex.

The first prong of the ineffectiveness test has most likely been met. The claim that trial counsel raised a prior bad act is a claim that has arguable merit. Evidence of a defendant's prior bad act is generally inadmissible.

Petitioner's Exhibit: 10

discussions and arguments with her and her brother, the defendant and the victim went to bed and had consensual sexual intercourse. (TT 285 - 294). The next morning. Friday, the defendant and victim woke up at about 11:00 o'clock a.m., and the defendant eventually performed consensual oral sex on the victim (TT 298, 303).

The two slept together on Friday night and when they woke up on Saturday morning the defendant eventually had oral sex on the victim. (TT 310). The defendant's testimony on whether or not the victim consented or was forced is somewhat mixed. In his direct testimony when he was asked if the sexual activity was consented to or not he said: "I persuaded her and I do believe that she responded back so I would have to say it was consensual." (TT 310-311).

He said that in the discussions the two were having after sex that the victim said she could deal with the sex but could not deal with the arguing and bickering (*Id.*).

On cross-examination the defendant testified that he did not know if the victim consented. "She did not say no." (TT 360). He said that he initiated the sex. He started kissing her and she kissed him back. (TT 362). She never told him to stop doing cunnilingus on her. (TT 370).

The defendant did admit to Officer Trenga, as to the Saturday morning event, that she said that she did not want him to do that but yet he went down between her legs and performed oral sex on her. (TT 371-72, 386). He then went on to say that he might have forced it upon her. (TT 372, 376, 386).

Later on he said that he did not use force on her but that he was persuasive and she acted voluntarily (TT 441, 443 - 44).

The victim testified that she did not consent to any of the sexual intercourse, frontal or oral, that the two engaged in on Friday and Saturday.

The purpose of a jury charge is to clarify the legal principles that are at issue in the case. *Writtenhouse v. Hanks*, 777 A.2d 1113, 1118 (Pa. Super 2001).

Petitioner's Exhibit: 11

been different.  The first and third prongs of a successful ineffective assistance of counsel claim have not been met.  *Commonwealth v. Hutchinson*, supra.

Trial counsel, in his cross-examination of the victim, got her to admit that what she told Officer Trenga, at the time of his investigation, was wrong. This challenge to the victim's credibility was adequately presented to the jury. Even if we were to conclude that trial counsel should have endeavored to cross-examine Office Trenga on the victim's investigation statement, we cannot say that that one factor would have changed the outcome of the case.


### Conclusion

The defendant has not proven to us that trial counsel rendered ineffective assistance of counsel.  The jury really saw through most of the Commonwealth's case.  Quite simply, the defendant's testimony that he engaged in cunnilingus with the victim brought this convoluted case down to one very simple issue – whether or not the defendant did so through the use of "forceable compulsion."

**December 8, 2005**


James H. Hodson, III
# EL 3079
301 Morea Road
Frackville, PA  17932


Clerk of Court
United States District Court
Western District of Pennsylvania
P.O. Box 1820
Erie, PA  16507


RE: Case Number: C.A. No. 05-92 Erie


Dear Clerk of Court,

    Enclosed is a copy of the Petitioner's brief in response to the
Respondent's brief in this case.




Respectfully Submitted,

*James H. Hodson III*
James H. Hodson, III
Pro Se




Enclosure
Cc: File, District Attorney of Crawford County