1            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   JAMES HARRY HODSON, III,        :
             Petitioner            :
4                                   :
        v.                          :   C.A. No. 05-92 Erie
5                                   :
    MARILYN BROOKS, et al.,         :
6            Respondents            :

7

8

9         Evidentiary Hearing in the above-captioned

10     matter held on Thursday, December 21st, 2006,

11     commencing at 10:11 a.m., before the Honorable

12     Susan Paradise Baxter, 17 South Park Row, Room A280,

13     Erie, Pennsylvania 16501.

14

15

16

17  For the Petitioner:

18      Thomas A. Patton, Esquire
        Office of the Federal Public Defender
19

20  For the Respondents:

21      Noah Erde, Esquire

22

23

24

25          Reported by Janis L. Ferguson, RPR, CRR

1

```
1                           I N D E X

2

3    TESTIMONY OF JAMES H. HODSON, III
           Direct examination by Mr. Patton  . . . . . . .  4
4          Cross-examination by Mr. Erde . . . . . . . . 39
           Redirect examination by Mr. Patton  . . . . . . 51
5
     TESTIMONY OF ROSS PRATHER
6          Direct examination by Mr. Patton  . . . . . . . 54
           Cross-examination by Mr. Erde . . . . . . . . . 85
7          Redirect examination by Mr. Patton  . . . . . . 88

8    TESTIMONY OF VINCENT S. TRENGA
           Direct examination by Mr. Erde  . . . . . . . . 91
9          Cross-examination by Mr. Patton . . . . . . . .100
           Redirect examination by Mr. Erde  . . . . . . .126
10

11

12

13   EXHIBITS:

14          Petitioner's Exhibit 1 - Page 33
            Petitioner's Exhibit 2 - Page 36
15          Petitioner's Exhibit 3 - Page 56
            Petitioner's Exhibit 4 - Page 59
16          Petitioner's Exhibit 5 - Page 62
            Petitioner's Exhibit 6 - Page 66
17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  The case before the Court is James

2    Harry Hodson, III, versus Marilyn Brooks, et al. It's

3    docketed at Civil Action 05-92 Erie.

4                Representing the Petitioner is Thomas Patton.

5    Representing the Respondents is Noah Erde.

6          THE COURT:  Good morning.  This is -- first of

7    all, it's unusual to see Mr. Patton on that side, as it's

8    probably unusual for you to be sitting on that side of the

9    courtroom.

10          MR. ERDE:  It is, Your Honor.

11          THE COURT:  We're here this morning on a motion

12   for evidentiary hearing by the Petitioner, Mr. Hodson, that

13   was granted, and because Mr. Hodson has the floor, you go

14   first, Mr. Patton.

15          MR. PATTON:  Thank you, Your Honor.  We'd call

16   Mr. Hodson.

17

18      J A M E S  H.  H O D S O N, III, first having

19      been duly sworn, testified as follows:

20

21          THE CLERK:  Please state your full name and spell

22   your last name for the record.

23          THE WITNESS:  Jim Hodson, H-O-D-S-O-N.

24

25

1                          DIRECT EXAMINATION

2    BY MR. PATTON:

3

4        Q.    Jim, are you the Petitioner in this case?

5        A.    Yes, I am.

6        Q.    And I want to ask you some questions about the

7    claims that you raise in your petition.  Okay?

8        A.    Okay.

9        Q.    Is it fair to say that one of the claims you raise

10   in your petition is that statement that was taken from you

11   by Meadville Police Officer Trenga was taken without you

12   being informed of your Miranda rights?

13       A.    That's correct.

14       Q.    I want to ask you some questions about that.

15   Okay?

16       A.    Okay.

17       Q.    Do you recall when Officer Trenga came to your

18   home?

19       A.    Yes, I do.

20       Q.    Okay.  Do you recall when that would have been?

21       A.    It would have been a Monday morning, early, like

22   around 1:00 a.m.

23       Q.    Would the date have been June 21st, 1999?

24       A.    Yeah.  Yes.

25       Q.    Now, what had you been doing on the prior date,

1    June 20th of 1999?

2         A.    I had left my ex-girlfriend at the time's house.

3    I went over to a friend of mine's house.

4         Q.    The exgirlfriend would be?

5         A.    The alleged victim in this case.

6         Q.    Lynn Devore.

7         A.    Lynn Devore, yes.

8         Q.    And you went to a friend's house?

9         A.    Yes.

10        Q.    Who was that?

11        A.    Jeff Mervine.

12        Q.    Jeff Mervine, M-E-R-V-I-N-E?

13        A.    Yes.

14        Q.    What did you do there?

15        A.    I walked to him about the relationship I had with

16   Lynn.  We -- we helped me basically get over the breakup

17   that I just had went through with her.  And we, in essence,

18   began drinking.

19        Q.    What time did you get to Alex's house?

20        A.    Jeff's.

21        Q.    Or Jeff's house.  Sorry.

22        A.    I got to Jeff's around maybe 12:30 in the

23   afternoon on Sunday.

24        Q.    Okay.  And how long were you there?

25        A.    Probably up until 3:30 in afternoon.

1     Q.    And I believe you said that you and Jeff did some

2  drinking during that time period?  Is that correct?

3     A.    Yes, we did.

4     Q.    We're talking about drinking alcohol beverages?

5     A.    Yes.

6     Q.    What were you drinking?

7     A.    Beer specifically at Jeff's house.

8     Q.    Between the time you got there at roughly

9  12:00 until about 3:00 or 3:30, roughly how many beers do

10  you think you drank?

11     A.    It wasn't that much.  I'm guessing probably around

12  three beers, if that.

13     Q.    Okay.  Did you end up leaving Jeff's place?

14     A.    Yes, I did.  We had called a friend of mine, Alex

15  Leonida, L-E-O-N-I-D-A.  I called him a friend of mine.  It

16  was a mutual friend, but I was more closer to Alex than Jeff

17  was.  And I called up Alex and asked him what he was doing.

18     Q.    Did you guys decide to do anything together?

19     A.    Yeah.  He said that this bar called the Junction

20  was open and that they had some food there and stuff, and he

21  asked if I wanted to go.  I think it was wing night or

22  something.

23     Q.    Did you end up going to this bar?

24     A.    Yes, we did.

25     Q.    And the bar's name is the Junction?

1         A.    The Junction, yes.

2         Q.    Where -- is it in Meadville?

3         A.    Yes.  It's outside of Meadville.

4         Q.    And who all went there with you?

5         A.    It was Alex, Jeff, and I.

6         Q.    And about what time did you leave Jeff's and go to

7    the bar?

8         A.    Alex showed up around 4:00, so probably around

9    4:15.

10        Q.    Once you got to the bar, what did you guys do?

11        A.    We shot some pool, we ate some wings or whatever

12   they had that night -- I forget exactly what it was -- and

13   we drank.

14        Q.    Were you drinking alcoholic beverages?

15        A.    Yes.

16        Q.    What were you drinking?

17        A.    I was drinking rum and Coke.

18        Q.    Okay.  How long, if you -- so you got to the

19   Junction probably somewhere around 4:15 in the afternoon.

20   What time did you end up leaving there?

21        A.    Around 12:30 that night.

22        Q.    Or actually 12:30 --

23        A.    That morning.

24        Q.    -- the next Monday morning.

25        A.    Yeah.

1        Q.    While you were at the Junction, do you have an
2    approximation of how many rum and Cokes you drank?
3        A.    It was a lot.  Approximately -- let's see.  That
4    was around maybe seven hours of drinking.  About 14 drinks.
5        Q.    Okay.  When you guys left, how did you get back to
6    your place?
7        A.    Alex -- we actually went to Alex's house
8    afterwards.
9        Q.    Okay.  You, Jeff, and Alex all went to Alex's
10   place?
11       A.    Yes.
12       Q.    What did you guys do there?
13       A.    We had a smoking session.
14       Q.    What were you smoking?
15       A.    Marijuana.
16       Q.    How much marijuana did you guys smoke?
17       A.    My best estimate would probably be a gram and a
18   half, almost two grams of marijuana.
19       Q.    How physically were you doing it?  Were you using
20   a bong, smoking a joint, or what?
21       A.    We were smoking out of a pipe.
22       Q.    Taking turns passing it around?
23       A.    Yes.
24       Q.    How long did that last?
25       A.    It wasn't more than 20 minutes.

1      Q.   All right.  After you guys finished doing that,
2  what did you do?
3      A.   Alex, Jeff, and I left.  Alex was the one who was
4  driving.  So he dropped off Jeff first at his house.
5      Q.   Okay.
6      A.   And then he swung around -- because I live closer
7  to Alex's house, he swung back and dropped me off at my
8  house -- my apartment, sorry.
9      Q.   Okay.  So you lived in an apartment?
10     A.   Yes.
11     Q.   Did you live with anyone else at that place?
12     A.   No.  It was just me.
13     Q.   When you got home to your apartment, roughly what
14  time in the morning was this?
15     A.   It was around 1:00 in the morning.
16     Q.   What did you do when you got home?
17     A.   I -- the first thing I did, which I normally did
18  when I was out, you know, for a long period of time, was
19  check my answering machine.
20     Q.   And when you checked your answering machine, were
21  there any messages there for you?
22     A.   Yeah.  There were quite a few of them, actually.
23     Q.   Okay.  And did you check any of those messages?
24     A.   Yes, I checked all of them, actually.  There
25  was -- there was some 60-odd messages left on my machine.

1    Q.   Were there messages left?

2    A.   No, it was all hang-ups.  The majority.

3    Q.   Did you try to figure out who it was that was

4    calling and leaving the messages?

5    A.   Yeah.  I didn't have caller I.D., but I had Star

6    69.  I tried Star 69 for the last number that was called.

7    My phone had been dead from being a cordless phone, so I put

8    it back on the charger.

9    Q.   So you have a cordless phone; is that right?

10   A.   Yes.

11   Q.   And it had been on the charger?

12   A.   Yes.

13   Q.   When you hit the Star 69, the phone -- the battery

14   was dead?

15   A.   Yeah.  Every time I hit a button, it would just

16   beep on me.  There wasn't even a dial tone.

17   Q.   So once you saw that it wasn't working and the

18   battery was dead, what did you do with the handset of the

19   phone?

20   A.   I put it back on its charger.

21   Q.   Right after you put the phone back on the charger,

22   what did you do?

23   A.   I -- I began reviewing the majority of the calls.

24   Because it would -- there would be a pause in between each

25   message, and then it would hang up, so I would have to go

 1    through every single one of those calls.

 2         Q.    Okay.  As you were doing that, at some point did

 3    you receive a telephone call?

 4         A.    Yes, I did.

 5         Q.    Who was it?

 6         A.    It -- when I answered the phone, it was Officer

 7    Trenga.

 8         Q.    Did you know Officer Trenga?

 9         A.    No, I didn't.

10         Q.    Did he identify where he was from?

11         A.    When I answered the phone, what the -- the

12    conversation was is I answered the phone, I said hello.  And

13    he immediately said my first name.  He said Jim.  And I said

14    yes.  He said, this is Officer Trenga from the Meadville

15    Police Department.

16         Q.    Did he say anything else?

17         A.    Yeah.  He said, would you mind coming down to the

18    station to answer a few questions.

19         Q.    What did you say?

20         A.    I asked if it was about Lynn and the pills.

21         Q.    And what happened after that?

22         A.    The phone -- it immediately died.

23         Q.    When you asked Officer Trenga about whether this

24    call was about Lynn and the pills, what were you referring

25    to?

1     A.   She had tried to commit suicide by overdosing on
2  medication.
3     Q.   And was that the subject of testimony both from
4  Lynn and you at your trial?
5     A.   Yes.
6     Q.   Okay.  And so is it accurate to say when you asked
7  if this was about Lynn and the pills, you were referring to
8  this suicide attempt by your exgirlfriend, Miss Devore?
9     A.   Yes.
10    Q.   That occurred the day before?
11    A.   Yes, it would have been the Saturday.
12    Q.   So Saturday, the 19th?
13    A.   Yes.
14    Q.   1999?
15    A.   Yes.
16    Q.   Did you get any response from Officer Trenga
17  before your phone went dead?
18    A.   No.  It just immediately -- I asked if it was
19  about Lynn and the pills, and it just immediately died.
20    Q.   After the phone died, did you try and call back or
21  get back in touch with Officer Trenga?
22    A.   Yeah.  I put it back on its charger to give it a
23  little bit of a charge, and then I called back, and it -- I
24  had got the operator, but it just went dead again, so I put
25  it back on its charger.

1      Q.   Okay.  After you had tried to call back, but your

2  phone went dead and you put it back on the charger, what did

3  you do?

4      A.   I -- I started getting undressed to go to bed, and

5  that's when I heard a knock at the door.

6      Q.   All right.  About how much time had passed from

7  the time that you had had this, you know, brief conversation

8  with Officer Trenga and you hear the knocking on your door?

9      A.   It couldn't have been more than five minutes.

10  Maybe even less.

11      Q.   All right.  Now, you had began taking your clothes

12  off to go to bed between the time when the phone cut off and

13  the knock on the door occurred.  What were you wearing when

14  the -- there was the knock?

15      A.   I was just in my boxers when -- when Officer

16  Trenga knocked on the door.

17      Q.   All right.  Did you go to your door to answer the

18  knock?

19      A.   Yes, I did.

20      Q.   In just your boxers?

21      A.   Yes.

22      Q.   All right.  Do you have -- does your door have a

23  window on it that lets you see, you know, who is outside

24  knocking?

25      A.   Yeah.  I didn't have a curtain on the door, so I

1   could see who was at the door.

2      Q.   All right.  When you were going to answer the door

3   after you heard the knocks, what did you see when you walked

4   up to the door?

5      A.   I saw Officer Trenga and Officer Gump standing

6   there.

7      Q.   Did you personally know their names and know who

8   they were at that point in time?

9      A.   I had no idea who they were.

10     Q.   Were they wearing police uniforms?

11     A.   Yes.

12     Q.   All right.  Did you open the door?

13     A.   Yes, I did.

14     Q.   What was said when you opened the door?

15     A.   First they -- they stepped in when I opened the

16   door, because it pulled open.

17     Q.   Okay.

18     A.   When I opened the door, they stepped in, and

19   Trenga was to the left and Gump was to the right.

20     Q.   Trenga was to your left --

21     A.   To my left, yes.

22     Q.   -- Gump to your right.

23     A.   Yes.

24     Q.   All right.  Did they introduce themselves or tell

25   you who they were?

1       A.    No.   I immediately went to the name tag.

2       Q.    All right.  What was said?

3       A.    Officer Trenga asked if I would come down to the

4  police station to answer a few questions.  He said that I

5  wasn't under arrest and I could leave at any time.

6       Q.    Now, when he said this to you and asked if you

7  would come down to the police station, what did you tell

8  him?

9       A.    I told him that I was tired and I wanted to go to

10  bed.

11       Q.    Okay.  And when you told him that, that you

12  just -- you were tired and you wanted to go to bed, did he

13  accept that answer and tell you that, all right, that he

14  would get back in touch with you, you know, at some other

15  time?

16       A.    No.   Not at all.

17       Q.    What was his response when you told him that you

18  were tired and you just wanted to go to bed?

19       A.    He told me that it was very important, and that he

20  needed to speak to me.

21       Q.    And when he was telling you this, are both he and

22  Gump standing in your apartment?

23       A.    Yes.

24       Q.    Do they both have police uniforms on?

25       A.    Oh, yes.

1        Q.    Are they both armed?

2        A.    Yes.

3        Q.    Did Trenga raise his voice to you?

4        A.    No.

5        Q.    What was his demeanor like when he responded to

6   your statement that you just were tired and that you wanted

7   to go to bed?

8        A.    It -- it seemed like a sense of urgency; that

9   he -- that he absolutely needed to speak with me at that

10  time.

11       Q.    Did he ever offer to speak with you in your

12  apartment?

13       A.    No.  It was always, come down to the station, let

14  me speak to you at the station.

15       Q.    After Trenga -- after you had told Trenga that you

16  were just tired and wanted to go to bed, and he told you

17  that it was important and that he wanted you to come to the

18  station, what did you say?

19       A.    I said, oh, I have been drinking and I can't

20  drive.

21       Q.    And what was his response?

22       A.    Then Trenga said, that's fine; we'll take you

23  down.

24       Q.    Now, Jim, at this point in time, after you had

25  told Officer Trenga that you wanted to -- you were tired and

1    you wanted to go to bed, and then he told you that it was

2    important and he wanted to speak with you, and then you said

3    that you couldn't drive and they said that they would take

4    you, did you feel like you had any choice as to whether or

5    not you were going to go to the police station that night

6    and be questioned by Officer Trenga?

7         A.   No.  I didn't think I had a choice at all.  I felt

8    that he was going to question me one way or another; whether

9    it was going to be there in the apartment or at the station,

10   but he wanted to go down to the station.

11        Q.   Okay.  When you told him you were tired and you

12   wanted to go to bed, in your mind, could you both go to bed

13   and go to sleep and go down to the station with Officer

14   Trenga to speak with him?

15        A.   No.  Not at all.

16        Q.   After they told you that they needed to speak with

17   you and that they would drive you down to the station, what

18   happened?

19        A.   I told him that I have to get dressed first.

20        Q.   Okay.  Did you get dressed?

21        A.   Yes.  I put on a pair of shorts and shirt.  This

22   was summertime.

23        Q.   Did you then leave the apartment?

24        A.   Yes.

25        Q.   And when you went out, what order did you guys go

1    out?

2         A.    I locked my door, and Officer Gump and Trenga

3    stood off to the side.  I lived -- the way my house -- my

4    apartment was set up, there was a decking in that -- there

5    were stairs that went down.  So when I locked my door and

6    closed it, I started walking, and Officer Gump and Trenga

7    were behind me.

8         Q.    Was there a police car sitting out in front of

9    your apartment?

10         A.    Yeah.  It was -- it was just right there.  I mean,

11    right in the parking lot.  There was a small parking lot

12    behind my apartment complex.

13         Q.    Was it a marked police car?

14         A.    Oh, yeah.

15         Q.    With the lights on top and everything?

16         A.    Yeah.

17         Q.    Where did they put you in the car?

18         A.    They put me in the back seat.

19         Q.    How did they put you in?

20         A.    Trenga reached over and pulled the door open, and

21    he said, watch your head, and he put my head down into the

22    back seat.

23         Q.    Were you handcuffed?

24         A.    No.  Not at all.

25         Q.    Once you got put in the back of the car, could you

1    open the door from the inside of the vehicle?

2        A.    I don't think so.  I didn't try, at least.

3        Q.    Now, did they then take you to the Meadville

4    Police Station?

5        A.    Yes, they did.

6        Q.    During the drive, did they ask you any questions?

7        A.    No.  It was silent.

8        Q.    Was there any talking at all during the drive?

9        A.    Not at all.

10       Q.    Did Officer Gump say anything to you while you

11   guys were in the apartment?

12       A.    Officer Gump?  Not that I can recall, no.

13       Q.    When you got to the police station, how did you

14   actually get inside the police station?

15       A.    We went in through the sallyport at the station.

16       Q.    When you're talking about a sallyport, are you

17   referring to an area where the police car can actually drive

18   into a garage-type area?

19       A.    It was actually kind of like a garage.  They

20   pulled in, and the garage door slid down behind us.

21       Q.    How did you get out of the car?

22       A.    They both stepped out of the vehicle, and whoever

23   was driving -- I don't know whether it was Gump or Trenga --

24   opened the door.

25       Q.    Where did you go from there?

1      A.    They led me to a doorway which went inside the
2  police station.
3      Q.    Okay.
4      A.    And one was in front of me -- one of the officers
5  were in front of me and one was behind me.  And we went to a
6  small office, and they opened up the door, and there was
7  a -- there was a small desk in there with two seats.
8      Q.    All right.  About how big was this room?
9      A.    An estimation, probably about 10 feet long by
10 8 feet wide.
11     Q.    Was there anything in there other than this desk
12 and two chairs?
13     A.    No, not really.
14     Q.    After they put you in that room, what happened?
15     A.    I think it was Trenga that said, have a seat.  And
16 I sat down in the chair that was sitting against the wall,
17 not in front of the desk.  And he closed the door, and he
18 walked away, and I just sat in there.
19     Q.    Was anyone else in the room with you?
20     A.    No.
21     Q.    Okay.  How long did you -- well, did anybody
22 eventually come back into the room?
23     A.    Yeah.  Officer Trenga did.
24     Q.    About how much time passed between the time when
25 Trenga told you to have a seat in the room and they closed

1    the door and left you sitting in there by yourself and then

2    the time that Trenga came back?

3        A.    It was probably less than 15 minutes.

4        Q.    Okay.  When Trenga came back, was anyone with him?

5        A.    No.  He was just sitting by himself.

6        Q.    Did he have anything with him?

7        A.    Yeah.  He had a small tape recorder, a note pad,

8    and pen.

9        Q.    When you say "a small tape recorder", would that

10   be the type of tape recorder that uses the small micro

11   cassettes?

12       A.    Yeah.

13       Q.    And you said he had a pad with him?

14       A.    Yeah.  A -- like a legal pad.

15       Q.    And a pen?

16       A.    And a pen.

17       Q.    Did he have any other papers with him at all?

18       A.    No.

19       Q.    What happened when he came in with the recorder

20   and the pad and the pen?

21       A.    He immediately sat the recorder right this side of

22   me (indicating).  It would have been in front of me to the

23   right, or it would have been like this, and the chair was

24   off to the right.  And he sat the tape recorder in front of

25   me off the right and then he sat down.

```
1        Q.    What did he say to you?

2        A.    He said, do you mind if I record our conversation.

3        Q.    What did you say in response to that?

4        A.    I said, no, not at all.

5        Q.    At all.  After you told him that you didn't mind

6   him recording your statement, what did he do?

7        A.    He began recording.  He hit the record button.

8   And then he started asking questions.

9        Q.    All right.  Now, at any time when he came back

10  into that room, did he discuss with you what is commonly

11  referred to as your Miranda rights?

12       A.    No.

13       Q.    Did he ever show you a piece of paper that had

14  your rights listed off and then had a place for you to sign,

15  saying that you understood your rights and waived your

16  rights?

17       A.    No.

18       Q.    Did you sign any paperwork that night at the

19  police station?

20       A.    Not at all.

21       Q.    Did he ever tell you that -- while you were at the

22  police station, did he ever tell you that you did not have

23  to speak to him if you did not want to?

24       A.    No.

25       Q.    Did he ever tell you while you were at the police
```

1  station before he started questioning you that anything you

2  said would be used against you?

3      A.   No.

4      Q.   When you were down at the police station, did he

5  ever tell you that you were free to leave whenever you

6  wanted?

7      A.   No.

8      Q.   Now, as you were in the police station in this

9  room, first before Trenga even came back after being there

10 by yourself, did you feel that you would be able to get up

11 and walk about if you felt like it?

12     A.   No.  He had closed the door when he walked in.

13     Q.   When Officer Trenga came back in and asked if you

14 minded him recording it and you said no and he turned the

15 recorder on, did he ever say to you then that, you know, you

16 didn't have to talk with him or that anything you used to be

17 used against you [sic]?

18     A.   No.

19     Q.   Have you ever had your Miranda rights read to you?

20     A.   Never.

21     Q.   On any occasion ever?

22     A.   No.

23     Q.   Now, as you're sitting there talking -- or waiting

24 for Trenga to start questioning you, what did you think he

25 was going to question you about?

```
 1              MR. ERDE:  I'm going to object, Your Honor.
 2              THE COURT:  On the basis?
 3              MR. ERDE:  It's irrelevant as to what he thought
 4    he was being questioned about.  He was --
 5              THE COURT:  All right.  Mr. Patton?
 6              MR. PATTON:  Judge, it is just -- part of the
 7    question is whether he felt -- whether he was in custody and
 8    when he felt he was free to leave and the seriousness of the
 9    charges -- you know, what he thought he was being questioned
10    about; impact on --
11              THE COURT:  He actually already testified to that
12    earlier on, so I'll allow that.  So I'll overrule it at this
13    time.  I understand we don't need to get far afield.  I'll
14    keep an eye on it.
15    BY MR. PATTON:
16         Q.   What did you think you were being questioned
17    about?
18         A.   I thought Lynn had actually killed herself by
19    overdosing on drugs.
20         Q.   And you thought -- so as you were sitting there,
21    you thought she was maybe dead?
22         A.   Yeah.  That was my -- my thought.
23         Q.   Now, at some point as Trenga is questioning you,
24    did you come to believe that he was actually questioning you
25    for some other reason?
```

1       A.    Yeah.

2       Q.    Other than Lynn perhaps being dead?

3       A.    Yeah.

4       Q.    And at some point -- what did you believe, anyway,

5    after the questioning had gone on for a while, he was asking

6    you about?

7       A.    I believed that he was asking me about me possibly

8    raping my ex-girlfriend.

9       Q.    And at some point after he had been talking with

10   you for a while, did you decide that you didn't want to

11   speak to him anymore?

12      A.    Yes, I did.

13      Q.    And did you tell him that?

14      A.    Yes.  I -- specifically I said, I don't want to

15   answer any more of your sex questions.

16      Q.    Now, when you did that, said you didn't want to

17   answer any more of his questions, were you doing that

18   because before the questioning started, Trenga had advised

19   you that if you answered his questions, that you could stop

20   answering them at any time?

21      A.    No.

22      Q.    Had Trenga ever told you that?

23      A.    No.  Not at all.

24      Q.    Now, after you told him you didn't want to answer

25   any more sex questions, did he then ask you some -- some

1   other questions?

2       A.   Yes, he did.

3       Q.   Now, after he had asked you questions other than

4   what I would refer to as the sex questions, did you then at

5   some point decide you just -- you wanted the tape recorder

6   turned off?

7       A.   I asked him if he could turn the recorder off.

8       Q.   And after he turned the recorder off, did you ever

9   mention talking to an attorney; that you wanted to talk to

10  an attorney?

11      A.   Yeah.  As soon as he turned the recorder off and

12  he said -- he said, go ahead, I said -- I said, I think

13  maybe I should talk to an attorney.

14      Q.   Now, your request or your statement that you

15  thought maybe you should talk to an attorney, did you make

16  that statement because Trenga, before he started questioning

17  you, had explained to you that if you wanted to have an

18  attorney present, you could have an attorney present?

19          MR. ERDE:  Objection.  Leading.

20          THE COURT:  Well, he has been --

21          MR. PATTON:  Judge, that calls for a yes or no

22  answer.  I mean, I can't -- it doesn't suggest what the

23  answer is.

24          THE COURT:  Overruled.

25  BY MR. PATTON:

1    Q.    Did you make the statement that you thought maybe

2    you should talk to an attorney because Trenga had told you

3    before he started questioning you that you could do that, if

4    you wanted to?

5    A.    No.

6    Q.    Did Trenga ever tell you that you had the right to

7    have a lawyer present while he was questioning you?

8    A.    No.

9    Q.    Did Trenga ever tell you that if you started

10   answering questions, could you stop at any time?

11   A.    No.

12   Q.    After you stopped the interview, what happened

13   then?

14   A.    He said, well, is there anything else that you'd

15   like to add.  And I said, well, I wish this weekend would

16   have never happened.

17   Q.    Did you eventually then leave the police station?

18   A.    Yes.

19   Q.    And how did you leave?

20   A.    He took me back out in the sallyport, put me in

21   the back seat of the squad car.

22   Q.    Who were they?

23   A.    It was just Trenga.

24   Q.    At any point in time while you were talking with

25   Officer Trenga in that interview room, was anyone else

```
 1   present?
 2        A.    No.
 3        Q.    Was anyone else ever in that room with you in the
 4   Meadville Police Department other than Trenga?
 5        A.    No.
 6        Q.    And Trenga alone took you home?
 7        A.    Yes.
 8        Q.    Okay.  Now, a couple months after all this
 9   happened, you ended up getting charged --
10        A.    Yes.
11        Q.    -- in Crawford County.  Is that correct?
12        A.    Correct.
13        Q.    All right.  Now, after you got charged, who
14   originally was representing you on these charges?
15             MR. ERDE:  I'm going to object, Your Honor.  This
16   is well beyond the purpose of this evidentiary hearing.  The
17   Court's order itself indicates the purpose of this hearing
18   is to -- one second -- determine whether the Petitioner
19   could demonstrate sufficient cause and prejudice to override
20   the exhaustion requirement.
21             MR. PATTON:  Judge, I need to speak to him about
22   what he talked with his attorneys about to --
23             THE COURT:  To discuss whether or not there's
24   ineffective assistance that would sufficiently be cause --
25   regular ineffective assistance is cause, that's correct, but
```

1    he could go down that road, so it's relevant.  Overruled.

2    BY MR. PATTON:

3        Q.    Who first was representing you on these charges?

4        A.    Edward J. Hathaway.

5        Q.    And did he eventually withdraw from your case?

6        A.    Yes, he did.

7        Q.    Do you know why?

8        A.    There was a potential conflict of interest.

9        Q.    While Mr. Hathaway was representing you, did you

10   receive any discovery with regard to your case?

11       A.    No.

12       Q.    After Mr. Hathaway withdrew from your case, who

13   ended up representing you?

14       A.    I was basically forced to go down to the Public

15   Defender's Office.

16       Q.    Okay.  And who from there was appointed to

17   represent you?

18       A.    Ross Prather.

19       Q.    Did you ever get discovery in your case from

20   Mr. Prather?

21       A.    Yes, I did.

22       Q.    Now, after you got the discovery in your case, did

23   you ever talk to Mr. Prather about the statement that you

24   made to Trenga?

25       A.    Yes, I did.

1    Q.   Did you ever talk to Mr. Prather about the fact
2  that you had not been informed of your Miranda rights?

3    A.   Yes.

4    Q.   You discussed that with Mr. Prather?

5    A.   Yes, I did.

6    Q.   Did you discuss with Mr. Prather the possibility
7  of Mr. Prather filing a motion to suppress your statement?

8    A.   Yes, I did.

9    Q.   Did you talk to Mr. Prather about trying to
10  suppress your statement based on the fact that you hadn't
11  been read your Miranda rights?

12    A.   That's correct.

13    Q.   Now, did he ever file a motion to suppress?

14    A.   Never.

15    Q.   Now, originally when you were charged in the
16  Criminal Complaint and then later in the Information, were
17  you ever charged -- up until the time your trial started,
18  was there ever a charge that you had forcibly performed
19  cunnilingus on Miss Devore?

20    A.   No.

21    Q.   Did that charge appear on the morning of your
22  trial?

23    A.   Yeah.  They called it the 11th hour event.

24        MR. ERDE:  Your Honor, I'm going to object again
25  to this line.  This goes nothing to the statement, which is

1    the purpose of the evidentiary hearing; to determine whether
2    or not the statement was --
3            THE COURT:  That's part of it, but he has four
4    claims -- as I recall, four claims in his habeas petition.
5    And we have to get past whether or not exhaustion can be
6    excused.  And the test there is cause and effect -- cause
7    and prejudice.  And that's a pretty --
8            MR. ERDE:  That doesn't go to the issue of
9    suppression.  This edition --
10           THE COURT:  I think it goes directly to
11   suppression, actually.
12           MR. ERDE:  Okay.
13           MR. PATTON:  And, Your Honor --
14           THE COURT:  Often causes the same thing as
15   underlying merits.  It's just a different test.
16           MR. PATTON:  It's going to be our position that
17   this claim has been exhausted.  There isn't any problem with
18   exhaustion.
19              The underlying claim, and the one that I'm
20   going to focus on in this hearing, is that one that
21   Mr. Prather provided ineffective assistance of counsel by
22   not filing a motion to suppress.  So in doing that, we need
23   to establish that his decision not to file the motion was
24   outside the reasonable performance --
25           THE COURT:  The test of effective counsel.

1            MR. PATTON:  -- of competent counsel.  Mr. Prather

2    is going to testify about that, but part of it needs to be

3    about what Mr. Hodson had talked to about -- had talked with

4    Mr. Prather about.

5            THE COURT:  These are the things that weren't done

6    in a previous evidentiary hearing that we have to hear now.

7    So it goes to the merits as well?

8            MR. PATTON:  Correct.

9            THE COURT:  I'm not going to come back and take

10   testimony, so I'll take it all now, depending on whether or

11   not we get there.

12   BY MR. PATTON:

13       Q.   Now, Jim --

14            THE COURT:  And you have cross-examination.  I'm

15   sorry.  Go ahead.

16       Q.   Jim, on the morning of your trial, was one count

17   of the Information amended?

18       A.   Yes, it was.

19       Q.   Was that your understanding?

20       A.   Yes.

21       Q.   And did it change one of the charges, one of the

22   involuntary deviate sexual intercourse charges?

23       A.   Yes, it did.

24       Q.   How did it change it?

25       A.   It went from a threat of fellatio to a force of

1  cunnilingus.

2      Q.    Now, after the Judge allowed that amendment to be

3  done, did you and Mr. Prather ever discuss the need to file

4  a motion to suppress based on the fact that the charges had

5  changed against you?

6      A.    No.

7      Q.    Okay.

8      A.    This happened day of trial.

9      Q.    After you were convicted, did you talk with

10 Mr. Prather about filing an appeal?

11     A.    Yes, I did.

12     Q.    And did you, in fact, have some exchange of

13 correspondence between yourself and Mr. Prather about the

14 appeal and issues related to that?

15     A.    Yes.

16     Q.    And did you receive a letter from Mr. Prather

17 regarding whether or not he had filed an appeal or whether

18 he was going to file an appeal?

19     A.    Yes, I did.

20          (Discussion held off the record.)

21          (Petitioner's Exhibit 1 marked

22           for identification.)

23     Q.    I want to show you Plaintiff's Exhibit 1 --

24          MR. PATTON:  Your Honor, this was in the State

25 Court record.  It was attached to the first State Court

1    Order regarding the first PCRA petition.

2        Q.   Jim, can you take a look at that.

3        A.   Yes, sir.

4        Q.   It was also attached to --

5            MR. PATTON:  Your Honor, this was also attached to

6    Mr. Hodson's reply brief that he filed with this Court as

7    Exhibit 4.

8            THE COURT:  All right.

9    BY MR. PATTON:

10       Q.   Jim, do you recognize Petitioner's Exhibit 1?

11       A.   Yes, I do.

12       Q.   What is it?

13       A.   It's a letter from Ross Prather dated

14   October 18th, 2000.

15       Q.   Now, in the first paragraph of that letter --

16           THE COURT:  Hold on one second.

17           MR. PATTON:  Your Honor, I have another copy of

18   this, if you'd like.

19           THE COURT:  That will be fine.  I should be able

20   to pull it up on my computer screen.

21   BY MR. PATTON:

22       Q.   Jim, in the first paragraph of that letter, does

23   Mr. Prather make any comments regarding whether you and he

24   had discussed in the past your belief that you had not been

25   Mirandized by Trenga?

1       A.   Yes, it does.

2       Q.   And what does it say with regard to that?

3       A.   It said, "You have mentioned in the past that you

4    did not receive your Miranda rights."

5       Q.   Then what else -- what does it go on to say?

6       A.   That also would be an issue which would be

7    addressed not on a direct appeal, but within a PCRA

8    petition.

9            MR. PATTON:   Judge, I'm not actually going to move

10   Petitioner's Exhibit No. 1, because it's already in the

11   record.

12           THE COURT:   It's already in the record.

13           MR. PATTON:   Actually, in a couple places.

14           THE COURT:   Okay.

15   BY MR. PATTON:

16      Q.   Jim, did you file a Post-Conviction Relief Act

17   petition in Crawford County after you were convicted?

18      A.   Yes, I did.

19      Q.   Is it accurate to say that you actually filed two

20   of those?

21      A.   Yes.

22      Q.   I want to focus on the first one.  Okay?

23      A.   Okay.

24      Q.   And when you filed your first petition, did you

25   raise a claim of ineffective assistance of counsel regarding

1    Mr. Prather?

2        A.    Yes, I did.

3        Q.    And what was the -- what were the grounds for the

4    ineffective assistance?

5        A.    That he failed to suppress my statement made to

6    the police.

7        Q.    Now, was this a petition that you did yourself?

8        A.    Yes, it was.

9              (Petitioner's Exhibit 2 marked

10              for identification.)

11       Q.    Jim, I want to show you Plaintiff's Exhibit 2.

12   You have Plaintiff's Exhibit 2.  Is that the first PCRA

13   petition you filed in Crawford County?

14       A.    Yes.  Yes, it is.

15       Q.    And on, I believe, the third page of that

16   document, in the Section B, where it says to state your

17   claims, do you see that?

18       A.    It says, "The following facts were made known to

19   me by other means than my personal knowledge."

20       Q.    Let me see that for a second.  Does it say -- the

21   top of Page 3 -- and this is a pre-printed form.  Says, "The

22   facts in support of the alleged errors upon which this

23   motion is based are as follows:"  And what did you write

24   first?

25       A.    "Attorney Ross Prather was ineffective by, one,

1    failing to file a motion to suppress my statement, which was

2    illegally obtained."

3        Q.    And then does it go on to list other grounds as

4    well?

5        A.    Yes, it does.

6        Q.    Now, in Section B, which is also on Page 3 -- or

7    C -- excuse me -- it says, "In the event my appeal is

8    allowed as requested," and under Paragraph 4, "The following

9    are matters I wish to assert on appeal:"

10           What do you have written in there?

11       A.    "Ross Prather was ineffective numerous times on

12    certain issues that would have had a different outcome

13    before, during, or after my trial.  Miranda rights.

14    Mistrial.  Rape Shield Law.  Section 10 of Pennsylvania

15    Crimes Code.  Sixth Amendment evidence that supports charge;

16    specifically corpus delicti.  Trial counsel erred in not --"

17    I can't even read my own writing.

18       Q.    It's a dark copy.

19       A.    Yeah.

20       Q.    Not asking proper jury instructions?

21       A.    Yes.

22       Q.    And then also Megan's Law?

23       A.    Yes.

24       Q.    Now, you have read in there that you said that,

25    "Ross Prather was ineffective on numerous items that would

1   have had a different outcome before, during, and after my
2   trial."  And then it says "Miranda rights".
3        A.   Yes.
4        Q.   What did you mean when you put down "Miranda
5   rights"?
6        A.   I meant that I was never read my Miranda rights.
7   And if my -- what it says on your Section C is, "In the
8   event my appeal was allowed as requested under No. 4, the
9   following are matters which I intend to assert on that
10  appeal."  Which I was going to bring up that Ross had
11  never -- I had never read my -- never been read my Miranda
12  rights.
13       Q.   Okay.  Was counsel eventually appointed to
14  represent you on that PCRA petition?
15       A.   Yes, it was.
16       Q.   And was an amended petition filed?
17       A.   Yes.
18       Q.   And did you speak with the attorney -- well, who
19  is the attorney that was representing you -- or appointed to
20  represent you on that?
21       A.   Edward Hathaway.
22       Q.   And did you speak with Mr. Hathaway before he
23  filed the amended petition?
24       A.   Not verbally.  We communicated through letters.  I
25  was in Camp Hill at the time.

1      Q.   And is it your understanding that the amended
2  petition continued to raise a claim that your Miranda rights
3  had been violated?
4      A.   I assume that Ed knew what he was doing, so, yeah.
5  Whatever he had put down in my amended PCRA was what I
6  believed that should have been there.
7           MR. PATTON:  Your Honor, those are my questions
8  for Mr. Hodson.
9           THE COURT:  Cross-examination.
10          MR. ERDE:  Thank you, Your Honor.
11
12                    CROSS-EXAMINATION
13 BY MR. ERDE:
14
15     Q.   If you don't understand a question, don't answer
16 it.  Just let me know that you don't understand the
17 question.  Okay?
18     A.   Okay.
19     Q.   There's a knock at your door.  You look through
20 the window, and you see it's two police officers.
21     A.   Yes.
22     Q.   You open the door.  Right?
23     A.   Yes.
24     Q.   They came in.
25     A.   Yes.

1          Q.    They asked if you would come down and speak to
2     them at the station.

3          A.    Yes.

4          Q.    They told you, you weren't under arrest.

5          A.    Yes.

6          Q.    You said you were tired, and they said it was
7     urgent and asked if you would come down.

8          A.    Yes.

9          Q.    And you agreed.

10         A.    Yes.

11         Q.    At no time in your apartment did they tell you,
12    you were under arrest.

13         A.    No, they didn't say that.

14         Q.    You were wearing boxers?

15         A.    Yes.

16         Q.    You went and got dressed?

17         A.    Yes.

18         Q.    Did one of the officers go with you?

19         A.    No.

20         Q.    You had --

21         A.    I mean, I had a small efficiency apartment.

22         Q.    Did you ever ask them to leave the apartment?

23         A.    No.

24         Q.    You then testified that Officer Trenga opened the
25    back door for you to get in, told you to watch your head.

1      A.    Yes.

2      Q.    And helped ensure that you didn't bump your head

3    against the door.

4      A.    Yes.

5      Q.    Were you handcuffed before you were placed in the

6    cruiser?

7      A.    No.

8      Q.    Were you placed under arrested before you were

9    placed in the cruiser?

10      A.    No.

11      Q.    You said that they didn't ask you any questions

12    while you were driving -- while they were driving you to the

13    station.

14      A.    That's correct.

15      Q.    Did you try to get out of the vehicle --

16      A.    No.

17      Q.    -- while they were taking you down?

18      A.    Not at all, no.

19      Q.    You then testified that you went into the police

20    station, and they took you into a room, asked you to have a

21    seat or told you to have a seat, closed the door, and left.

22      A.    Yes.

23      Q.    And they were gone for about 15 minutes?

24      A.    Roughly.  It was probably less than that.

25      Q.    Was the door locked?

1      A.   I don't know.  I didn't try to open it.

2      Q.   When Officer Trenga came back, you said he had a

3  tape recorder.

4      A.   Yes.

5      Q.   And he asked if it was okay that he tape-record

6  the conversation.

7      A.   Yes.

8      Q.   And you said yes?

9      A.   Yes.

10     Q.   So you knew that you could say yes or no to

11  whether or not the conversation would be recorded.

12     A.   I didn't know.  He just asked if I minded.

13     Q.   And you said yes.

14     A.   Yeah.

15     Q.   Before that, were you told that you were under

16  arrest?

17     A.   No.

18     Q.   Were you ever told you weren't free to leave?

19     A.   No, I was never told that.

20     Q.   In fact, the only time, as you would testify, that

21  they ever talked to you, they said you're not under arrest

22  and you're free to go.  You're free -- if you come down to

23  the station, you're free to go.

24     A.   They didn't say that specifically.

25     Q.   Now, your testimony was you thought you were there

1   to talk about either an attempted suicide or a suicide by

2   your ex-girlfriend, Miss Devore.

3        A.   Yes.

4        Q.   Had you done anything wrong with her suicide

5   attempt, or what you thought might have been a suicide?

6        A.   I'm sorry; can you rephrase the question?

7        Q.   Had you done anything wrong, in had you done

8   anything criminal, to your knowledge, about her -- her

9   suicide attempt?

10       A.   No.  Not to my knowledge, no.

11       Q.   So you had no reason to think you had done

12   anything wrong.

13       A.   Correct.

14       Q.   You had no reason to think that you were under

15   arrest.

16       A.   Well, the thing is, is I had --

17       Q.   It's a yes or no question.  You had no reason to

18   think you were under arrest.

19       A.   There was reason to believe that, yeah.

20       Q.   They hadn't placed handcuffs on you.

21       A.   No.

22       Q.   They hadn't told you that you were under arrest.

23   And they asked if they could talk to you.

24       A.   (Witness nods head.)

25       Q.   And you agreed to go down to the police station.

1      A.    (Witness nods head.)

2            THE COURT:  Is there a question?

3      Q.    And yet you had reason to believe that you were

4  under arrest.

5      A.    There was -- there was something that did happen.

6      Q.    What happened?

7      A.    I threw the pills at Lynn.  She had a bag of

8  pills, and I threw them at her.

9      Q.    You testified that at one point you told Officer

10 Trenga you didn't want to answer any more sex questions.

11     A.    Yes.

12     Q.    Did he ask you any more sex questions at that

13 time?

14     A.    No, he didn't.

15     Q.    At one point you said you wanted -- you asked if

16 he would stop recording, and he stopped recording, didn't

17 he?

18     A.    Yes.

19     Q.    You asked to go home.

20     A.    I -- actually, I asked if he would mind turning

21 the recorder off.

22     Q.    Can you stop this for a second, or something to

23 that effect?

24     A.    Yes.  I'm sorry.

25     Q.    And he stopped the recorder.

 1      A.    Yes.

 2      Q.    And you asked to go home?

 3      A.    No, I didn't.

 4      Q.    At no point did you ask to go home.

 5      A.    No.

 6      Q.    They just took you home.

 7      A.    Yes.

 8      Q.    I'm a little confused how the alcohol plays into

 9 this.  What is the relevance of you having had 14 or so

10 drinks, or I guess it was 17 drinks over a 14-hour period?

11           MR. PATTON:  Objection, Your Honor.  That's asking

12 the witness for a legal opinion.  He's here to testify to

13 facts, as to what happened.

14           THE COURT:  He might know what you were up to.  I

15 don't know.  But he doesn't have to answer the legal aspect.

16 He can just answer the question, if he can.  If he can

17 answer the question, he can.  Go ahead.  Overruled.

18      A.    Can you repeat the question?

19      Q.    What was the relevance of you having that 17 or so

20 drinks -- 14 drinks, 17 drinks over a 14-hour period when

21 the police arrived at your residence?

22      A.    My state of mind.

23      Q.    Do you not think that you were sober?

24      A.    I knew I wasn't sober.

25      Q.    Did you understand what was going on?

1       A.    No.  I was so confused.

2       Q.    Did you not understand the questions?

3       A.    That he was asking me?

4       Q.    Yeah.

5       A.    I could understand as if we were conversating,

6   yeah, but I didn't know where he was going with the whole

7   questioning.

8       Q.    But you understood the questions.

9       A.    The questions specifically, yes.  Not the frame --

10      Q.    I'm sorry?

11      A.    Not the frame of the questions; why I was there.

12      Q.    But you understood the questions he was asking.

13      A.    Yes.

14      Q.    You would agree with me -- you've read the

15  transcript?

16      A.    Yes.

17      Q.    You would agree with you that you were responsive

18  to the questions?

19      A.    Yes.

20      Q.    He would ask you what time and you would tell him

21  the time; things of that nature.

22      A.    I don't know that that was a question.

23      Q.    Well, about, let's say, what happened with the

24  pills.  He would ask you what happened with the pills, and

25  you would answer what happened to the pills.

1        A.    I guess, yes.

2        Q.    You stated that you were forced to go to the

3   Public Defender's Office to obtain counsel.

4        A.    Yes.

5        Q.    You understand that you had the right to represent

6   yourself?

7        A.    I don't think that was an option for me.

8        Q.    You understand that Constitutionally you had the

9   absolute right to represent yourself?

10       A.    I guess, yeah.  On some level, yes.

11       Q.    So you weren't forced to go to the Public

12  Defender's Office.  You chose to go to the Public Defender's

13  Office.

14       A.    Yeah.

15       Q.    About how long would you say you were speaking

16  with Officer Trenga at the police station that evening?

17       A.    I -- I honestly don't know.  I couldn't tell you.

18       Q.    What leads you to believe that you were so

19  intoxicated that you couldn't understand what was going on?

20       A.    It was the next day, actually.

21       Q.    Did you ever tell the officers, look, I'm too

22  drunk to talk about this; I don't understand what's going

23  on?

24       A.    No.

25       Q.    Did you ever tell them, I know I'm not supposed

1   to, but I took a couple of hits off a marijuana pipe; I'm

2   too high to talk to you about what's going on; I don't

3   understand what's going on?

4       A.    That wouldn't have been something I would have

5   brought to their attention.

6       Q.    There was no way for them to know that you didn't

7   understand what was going on, because you gave responsive

8   answers, and you never told them.  Isn't that correct?

9           MR. PATTON:  Objection, Your Honor.  He's asking

10  Mr. Hodson to give an opinion as to whether or not the

11  officers knew or didn't whether he had been drinking.  He

12  can't testify as to what they knew or didn't know or what

13  they had reason to know or didn't know --

14          THE COURT:  You can rephrase the question.  It's

15  what he knew.  You can rephrase the question.  Sustained.

16          MR. ERDE:  Can you read back the question, please.

17          (Record read back by the reporter.)

18  BY MR. ERDE:

19      Q.    You never articulated to them that you were

20  intoxicated.

21      A.    Yes, I did.

22      Q.    When was that?

23      A.    That was at my house.  That was why they took me

24  to the police station.  I told them that I had been drinking

25  and I couldn't drive.

1    Q.   That was why he took you in the cruiser.

2    A.   Yes.

3    Q.   You never articulated to them that you were too

4    high to drive.

5    A.   Like I said, that wouldn't have been something I

6    would have brought to their attention.

7    Q.   You never articulated to them that you were too

8    drunk or too high to answer questions, only to drive there.

9    A.   That's correct.

10    Q.   With that framework, you gave the officers no

11    reason to think that you were under the influence of alcohol

12    or drugs to the point that you were incapable of answering

13    questions.

14         MR. PATTON:  Your Honor, he can't testify if he

15    did something that led the officers to believe that he had

16    or hadn't been drinking, because that asks him to try and

17    interpret what the officers knew or didn't know.

18         THE COURT:  Well, the testimony is already in the

19    record about what he told them, so I think I'll sustain

20    that.

21    BY MR. ERDE:

22    Q.   At no point did Officer Trenga threaten you to

23    answer the questions, correct?

24    A.   Correct.

25    Q.   At what point did you realize that they weren't

1  there -- or he wasn't there to talk to you about Miss Devore

2  and the pills?

3          A.    The way he piled the sex questions on me.

4          Q.    But at what point?

5          A.    I don't know.  I don't -- I don't understand the

6  question.

7          Q.    Was it shortly before you asked him to stop the

8  recorder?

9          A.    Yes.

10         Q.    So as soon as you realized what was going on, you

11  asked him to stop.  Very shortly thereafter.

12         A.    He asked me some more questions during that time.

13         Q.    Once you articulated -- or once you realized what

14  was going on and you asked him to stop, he stopped.

15         A.    Yes.

16         Q.    Were you placed under arrest that night at all?

17         A.    No.  Not at all.

18         Q.    When you spoke with Attorney Prather about filing

19  a motion to suppress, why did you think the statement should

20  be suppressed?

21         A.    Because I wasn't read my Miranda rights.

22         Q.    What part did you think had been violated?

23         A.    I thought that was just something that they were

24  supposed to do, was read you Miranda rights, question you,

25  and let you know what was going on.

1       Q.   I'm not sure I understand.  You just thought
2    they -- anytime the police talked to you, they were supposed
3    to read you Miranda?
4       A.   Yeah.  I was incarcerated prior to getting
5    charged, forming the charge with this [sic].
6       Q.   I'm still not sure I understand.  What is --
7       A.   I was going to the law library and reading up on a
8    bunch of stuff.
9       Q.   Okay.  Okay.  I understand now.  So you had these
10   discussions with Attorney Prather after you were
11   incarcerated, but before trial; that there should be a
12   motion to suppress.
13      A.   Correct.
14      Q.   On the grounds that you thought they hadn't read
15   you Miranda rights.
16      A.   Correct.
17           MR. ERDE:   I have no further questions at this
18   time, Your Honor.
19           THE COURT:  Thank you.  Redirect?
20
21                      REDIRECT EXAMINATION
22   BY MR. PATTON:
23
24      Q.   When Officer Trenga and Officer Gump were in your
25   apartment, and Officer Trenga asked you if you would come

1    down to the police station to talk to them about Lynn, when

2    they asked you that for the first time, what was your

3    response?

4        A.    When they asked me initially when they walked in?

5        Q.    Correct.

6        A.    I told them that I was tired and I wanted to go to

7    bed.

8        Q.    Now, did they -- after you told them that, did

9    they say, okay, that's -- that's fine, we'll come back

10   later?

11       A.    No.

12       Q.    What did they say to you after you told them that

13   you -- in response to them saying they wanted you to go to

14   the police station to answer their questions and you said,

15   I'm tired, I want to go to bed, what did they say?

16       A.    He told me that it was very important and that I

17   needed to speak with him.

18       Q.    When they told you that, what did you say?

19       A.    I told them that I had been drinking; I couldn't

20   drive.

21       Q.    And their response was what?

22       A.    That's fine; we'll take you down.

23       Q.    After you had told Officer Trenga that you were

24   tired -- after he asked you if you would come down to the

25   station and ask questions -- and answer questions, and you

1    told him that you were tired and you wanted to go to bed,

2    and Officer Trenga said, no, it was important, that he

3    needed to speak with you, did you think that you -- that

4    they were going to honor your request to go to bed and just

5    let you go to sleep?

6        A.    No.    There -- it really seemed urgent that he

7    speak to me.

8        Q.    Did they ever offer just to say, okay, we'll sit

9    down with you here in your apartment and ask you some

10   questions?

11       A.    No.

12       Q.    Was the request always for you to go with them to

13   the police station?

14       A.    Yes.

15            MR. PATTON:  I have no questions.

16            MR. ERDE:  Nothing further.

17            THE COURT:  All right.  You may step down.  Thank

18   you.

19            MR. PATTON:  Your Honor, we'll call Ross Prather.

20            THE COURT:  Is he outside?

21            MR. PATTON:  Yes.

22

23        R O S S   P R A T H E R, first having been

24        duly sworn, testified as follows:

25

```
 1            THE CLERK:  State your full name and spell your
 2   last name for the record.
 3            THE WITNESS:  My name is Ross Prather.  It's
 4   spelled P-R-A-T-H-E-R.
 5
 6                      DIRECT EXAMINATION
 7   BY MR. PATTON:
 8
 9       Q.   Mr. Prather, what do you do for a living?
10       A.   I'm an attorney.
11       Q.   You practice criminal law?
12       A.   Yes, I do.
13       Q.   How long have you been a practicing attorney?
14       A.   Well, I received my law degree in 1993, but I have
15   not practiced law all of the years since 1993.  I'm going to
16   say that there were four years that I did not practice law.
17   So from 1993 to the present, less four years.
18       Q.   Right now, do you have your own practice, or are
19   you employed by someone?
20       A.   I'm -- yes, I have my own firm.
21       Q.   Back in late 1999 and the year 2000, how were you
22   employed?
23       A.   Right about that time, I became the Chief Public
24   Defender.  And before I was the Chief Public Defender, I was
25   a part-time Public Defender.  So I was part employed with
```

1   the Public Defender's Office and part employed in private

2   practice.

3         I know that when I handled the Hodson trial, I was

4   the Chief Public Defender, and then fully employed through

5   the County in the Public Defender's Office.

6         Q.   We're talking about Crawford County?

7         A.   Yes.

8         Q.   So when you were an Assistant Public Defender for

9   Crawford County, that was a part-time position?

10        A.   That's correct.

11        Q.   But when you switched over to the Chief Public

12  Defender for Crawford County, that was a full-time position.

13        A.   Yes.

14        Q.   In late 1999, sometime like October,

15  November 1999, were you appointed to represent Jim Hodson on

16  some charges that had been filed against him there in

17  Crawford County?

18        A.   That sounds correct.

19        Q.   Were you the initial attorney that represented

20  Mr. Hodson on those charges?

21        A.   No.

22        Q.   How did you get involved?

23        A.   Another attorney handled, I believe, the

24  preliminary hearing, and -- and Mr. Hodson applied for a

25  Public Defender, and I was -- I was assigned the case.

1      Q.    Okay.  Do you recall what Jim was charged with?

2      A.    I can recall most of the counts, I believe, if not

3   all of them.  Basically -- I believe rape, a couple counts

4   of IDSI, simple assault.  There might have been more.

5      Q.    Would it be correct to say that normally the way

6   charges would initially be brought would be in a Criminal

7   Complaint that would have been filed against Jim?

8      A.    Correct.

9      Q.    And that is just the standard way the charges

10  would be brought in Crawford County?

11     A.    That's right.

12           (Petitioner's Exhibit 3 marked

13            for identification.)

14     Q.    Mr. Prather, I want to show you Plaintiff's

15  Exhibit 3 and have you take a look at that.

16     A.    (Witness complies.)  Okay.

17     Q.    Does that appear to be the Complaint, the Criminal

18  Complaint that was filed against Jim Hodson in the case of

19  Commonwealth versus Hodson?

20     A.    Yes, it's the Criminal Complaint.  Sometimes

21  there's an affidavit attached.  I don't see an affidavit.

22  And some other papers that are part of the preliminary

23  hearing process.

24     Q.    And that was Case No. 1999-868?

25     A.    Yeah.  That's the -- that's the Common Pleas

1    docket number.  At this point it would have had just a -- a

2    District Magistrate number, which would be different.  It

3    was assigned a Common Pleas docket number at a later time.

4        Q.  And what charges are alleged in the Criminal

5    Complaint?

6        A.  Rape, sexual assault, simple assault, involuntary

7    deviate sexual intercourse, two counts.  And that's all.

8        Q.  And the involuntary deviate sexual intercourse

9    charges, how does the Complaint allege that that offense was

10   committed in either -- in each count?

11           MR. ERDE:  Your Honor, I'm going to again object

12   to this line of questioning.  The request for the

13   evidentiary hearing clearly outlines the four specific

14   reasons for the hearing, and none of it deals with an

15   amended Information at the time of trial.  It deals with

16   Miranda and ineffective assistance for failing to file a

17   motion to suppress.  It then talks about the default

18   procedure -- procedural default, and it goes on to say based

19   on this, there -- the jury would be unable to find him

20   guilty beyond a reasonable doubt.

21           THE COURT:  Are you planning to amend the

22   petition?

23           MR. PATTON:  No, Judge.  This -- this is going to

24   be part of the explanation for why a motion to suppress was

25   or was not filed and Mr. Prather's reasons for not filing

1    the motion to suppress.

2            THE COURT:  I'll allow it.

3    BY MR. PATTON:

4        Q.   Mr. Prather, could you explain to us, how does

5    the --

6        A.   Oh.

7        Q.   -- Complaint allege --

8        A.   Yeah.  Counts 4 and 5 are both involuntary deviate

9    sexual intercourse.  They both are with relation to an

10   incident from June 18 through 20, 1999.  They are both with

11   the victim being Lynn Devore, and they are both alleging

12   that the Defendant forced the victim to perform fellatio on

13   him.

14         I take it back.  There is a distinction.  Count 4

15   says the Defendant forced Lynn Devore.  Count 5 indicates

16   that it was by threat of forcible compulsion.  That seems to

17   be the distinguishment between the two counts.

18       Q.   And based on your experience as a criminal defense

19   lawyer, do those represent two separate ways to commit the

20   offense of involuntary deviate sexual intercourse?

21       A.   Yeah.  Two different ways to commit the same

22   crime.

23         MR. PATTON:  Judge, I'd move for the admission of

24   Plaintiff's Exhibit 3.  I'm not sure if it's in the record

25   or not.

1           THE COURT:  All right.  Mr. Erde, any objection?

2           MR. ERDE:  No.

3           THE COURT:  Petitioner's Exhibit 3 is admitted

4    into evidence.

5               (Petitioner's Exhibit 4 marked

6                for identification.)

7       Q.   Mr. Prather, I want to show you Plaintiff's

8    Exhibit 4.  Can you tell us what that is.

9       A.   This is a Criminal Information.

10       Q.   And is that the Criminal Information that was

11    filed against Jim in what had become Criminal No. 1999-868?

12       A.   That's correct.

13       Q.   Could you explain how that process of going from a

14    Criminal Complaint to an Information happens.

15       A.   Yeah.  It's not really something I'm involved in

16    as much as the District Attorney's Office is involved.

17           But what generally occurs is that after the

18    charges are bound over by the District Magisterial Judge,

19    the District Attorney's Office will prepare a Criminal

20    Information at some later point, and that is -- becomes

21    the -- the Complaint or the pleading for the criminal case

22    at the Common Pleas level.

23       Q.   Okay.  Would it be fair to say that once the

24    information gets filed, it supersedes the Criminal

25    Complaint, and the Information becomes the formal charging

 1    document?

 2        A.    That's correct.

 3        Q.    Do the charges that are listed in the

 4    Information -- or, yes, the Information that's Plaintiff's

 5    Exhibit 4, are they the same charges that were alleged in

 6    the Criminal Complaint?

 7        A.    Yes.

 8        Q.    And specifically with regard to the two IDSI or

 9    involuntary deviate sexual intercourse charges, were they

10    charged the same way in the Information as they were charged

11    in the Complaint?

12        A.    Yes.  Forcible compulsion at Count 4 and -- Count

13    4 -- I'm referring to the Information.  Count 4 says by

14    forcible compulsion.  Count 5 says by threat of forcible

15    compulsion.

16        Q.    Is the involuntary deviate conduct alleged in both

17    of them fellatio?

18        A.    That's correct.

19        Q.    At some point would you have received some

20    discovery from the Commonwealth with regard to Jim's case?

21        A.    Yes.

22        Q.    And at some point during this process did you

23    learn that Jim had made a statement to one of the officers

24    from the Meadville Police Department?

25        A.    Yes.

1      Q.    And had that statement been taped?

2      A.    Yes.

3      Q.    Would you have, in the discovery, received any

4   reports written by the police officers who -- well, any

5   police officer who had done work in the case?

6      A.    Yes.

7      Q.    Do you recall if you received a report that

8   Officer Trenga of the Meadville Police Department had -- had

9   written with regard to the case?

10     A.    Yes.

11     Q.    Now, in that report, was there any indication of

12  whether or not Jim had or had not been Mirandized prior to

13  making this tape-recorded statement?

14     A.    Yes.

15     Q.    What did the report indicate?

16     A.    The report by Officer Trenga said that he was

17  Mirandized.

18     Q.    Did the report indicate whether or not that waiver

19  had been memorialized in any way?

20     A.    I don't believe that it -- I can't recall whether

21  the report indicated that there was a signed waiver or not.

22     Q.    If I showed you a copy of the report, would that

23  refresh your recollection?

24     A.    Yes, it would.

25           THE COURT:   What is this paper report?   What?

1           (Petitioner's Exhibit 5

2            marked for identification.)

3    Q.   Can you tell us what that is.

4    A.   I am looking at Vincent Trenga's -- who is the

5 investigating officer -- police report.

6       MR. PATTON:  Judge, that's attached to -- it's in

7 the record attached to Jim's reply brief.  It's attached as

8 Exhibit 8.

9    A.   And this does refresh my recollection.

10    Q.   Okay.  Based on your having your recollection

11 refreshed, does the report indicate whether or not Jim's

12 waiver of the Miranda rights had been memorialized in some

13 way?

14    A.   Yes.  It indicates that he did sign a waiver,

15 which is -- means a waiver of his Miranda rights.

16    Q.   Were you ever provided with a copy of this waiver

17 form that Jim had supposedly signed?

18    A.   No.

19    Q.   Did you have any discussions with the prosecuting

20 attorney about the waiver and you obtaining a copy of it?

21    A.   Yes.

22    Q.   Could you tell us -- not word for word the

23 conversation, but basically what was discussed and what you

24 were told.

25    A.   The District Attorney -- the District Attorney and

1    I discussed this a couple of times.  At first, I think that

2    I indicated that I had not received a copy of the waiver in

3    the discovery package.  The District Attorney indicated to

4    me that they would get it and they would provide it for me.

5    There was some period of time that passed, and I still had

6    not received it.  And at a later date -- and if my

7    recollection is correct, I believe it was not too long

8    before the trial -- the District Attorney indicated to me

9    that they could not find the waiver.

10       Q.   So sometime before the trial, shortly before the

11   trial, you were -- you got a final answer of saying that

12   they could not find the waiver form that Officer Trenga was

13   saying that Jim had signed.

14       A.   Correct.

15       Q.   Now, during the time you represented Jim, in

16   preparing for trial, had Jim mentioned to you the fact that

17   he felt the statement could be suppressed because he had not

18   been read his Miranda rights?

19       A.   I don't remember the -- the exact content of the

20   discussion, and I don't remember whether Jim indicated

21   whether he thought it could be suppressed or not.  But at

22   some point before trial he did indicate to me that he did --

23   that he did not -- he was not given his Miranda rights.  At

24   what point, I can't recall.

25       Q.   But at some point -- sometime before --

1      A.    It was before trial.

2      Q.    It was before trial, okay.  Now, at any time prior

3   to the trial starting, did you file a motion to suppress the

4   statement?

5      A.    No.

6      Q.    Now, did you receive a copy of -- or a transcript

7   of the taped statement?

8      A.    Yes.

9      Q.    And did you and the prosecutor even at one point,

10  I think, sit down and listen to the tape to make sure that

11  the transcript was accurate?

12     A.    I -- I believe that we did.  I believe that we

13  did, but I'm not positive about that.

14     Q.    Now, with regard to the charges and how you were

15  going to defend the charges against Jim, was it going to be

16  your guys' trial strategy to argue that Jim and Miss Devore

17  had not engaged in any sexual conduct during the time period

18  charged in the information?

19     A.    No.

20     Q.    What was your plan going to be as to what -- what

21  your defense was?  What was your strategy?

22     A.    The defense was that -- that Jim had been with

23  Ms. Devore for that weekend, as Miss Devore indicated, and

24  that they had had sexual contact all through the weekend,

25  but that none of the sexual contact was forced or criminal.

1        Q.    Would you have been able to use Miss Devore's

2    explanation of how this had supposedly happened over a

3    three-day period in her own apartment to argue that, you

4    know, just her version of what happened just wasn't

5    believable?

6        A.    I could have.

7        Q.    Is it accurate -- well, was she basically claiming

8    that during this time period she couldn't leave and she was

9    afraid to leave and Jim just repeatedly had forced sexual

10   contact with her?

11       A.    That was -- that was her position, yes.

12       Q.    Now, you were obviously aware that this -- the

13   Commonwealth had this statement, this taped statement from

14   Jim that they planned to use in their case.  Is that

15   correct?

16       A.    Yes.

17       Q.    And for the most part, was the statement that Jim

18   gave necessarily inconsistent with what your theory of

19   defense was going to be?

20       A.    For the most part, it was not.  And then there

21   were other parts that were somewhat -- yeah, somewhat

22   against our defense.  Mostly by wording.

23            MR. PATTON:  I'm sorry, Your Honor; if I could

24   have just a moment.

25            THE COURT:  That's all right, go ahead.

1              (Pause in the proceedings.)

2      Q.   Was there, in fact, one particular point in the

3   tape when there was discussions about Jim performing oral

4   sex on Miss Devore where there was at least portions of it

5   where Jim had indicated that he felt he may have forced her

6   to engage in that conduct?

7      A.   Yeah.  What I would say is that there was one very

8   short segment of the transcript which was particularly

9   troubling with regard to Jim's culpability.  There may have

10  been about two or three additional spots that were also

11  somewhat troublesome, but there was one that was

12  particularly bad.

13             (Petitioner's Exhibit 6 marked

14              for identification.)

15     Q.   Okay.  We'll show you Plaintiff's Exhibit 6.  I'll

16  have you take a look at that.

17     A.   Okay.  This is the transcript of the -- of the

18  interview that Officer Trenga conducted with Mr. Hodson.

19  I'm looking particularly at Page 10.

20     Q.   Now, does Page 10 of that transcript, does that

21  contain the -- what you refer to as the one portion of the

22  statement that was potentially really bad for Jim?

23     A.   Yes.  This is -- this is probably the worst part

24  of the transcript.

25     Q.   And if you could, could you indicate for us --

1    we're on Page 10.   Read for us where this section is that

2    you thought was going to have potential problems for the

3    defense.

4         A.   Yeah, right about -- just a little less than

5    halfway down, it says, "Trenga:  You're telling me you still

6    were upset, but you still wanted to have sex with her."

7    "Hodson.  Yeah."  "Trenga:  You think you might have forced

8    it on her?"  "Hodson:  In a sense, yeah."  "Trenga:  But did

9    she ever tell you no or stop?"  "Hodson:  She goes -- well,

10   she actually would say, I don't want you to, and then I

11   would go down on her."  "Trenga:  Meaning you would go

12   between her legs and have oral sex?"  "Hodson:  Yeah."

13        That was probably the worst part of the

14   transcript.

15        Q.   And why is that the worst part?

16        A.   Well, I would say that it was arguable that we

17   could make this -- that the defense position could be that

18   he was somewhat persuasive for her to have maybe frontal

19   intercourse, and that she resisted; she said no.  And that

20   then he would go to something else, which would be

21   cunnilingus.  However, the wording here was not good.  The

22   wording here, where -- if you took out two lines, it says,

23   "You think you might have forced it on her," and he says,

24   "In a sense, yeah."

25        That certainly would not bode well for a defendant

1   in this situation.

2       Q.   And when he was asked to explain by Trenga what he

3   meant by forcing it on her, what specific sex act did Jim

4   refer to?

5       A.   Cunnilingus.

6       Q.   Now, prior to the day you guys would have started

7   picking the jury on -- which I believe was May 15th of 2000,

8   was there any charge in the information that charged Jim

9   with forcibly performing cunnilingus on Miss Devore?

10      A.   I don't know exactly what date, but it was right

11  when we were going into trial.  Whether or not we had picked

12  the jury yet, I'm not sure.  But the answer is, no,

13  cunnilingus was not charged in the Information, and it had

14  not been charged in the Information right up to the point

15  where we're meeting the Judge in chambers.

16           I think it was the night, as in 5:00, before

17  either we picked the jury or we did our opening statements

18  that the District Attorney brought it to the Judge's

19  attention with a motion to amend the Information.

20      Q.   Up until the District Attorney's Office asked to

21  amend the Information, did any of the charges against Jim

22  charge him with forcibly performing cunnilingus on

23  Miss Devore?

24           MR. ERDE:  Objection, Your Honor.  Now we're

25  beyond the scope of the --

1          MR. PATTON:  Judge, this is going to go directly

2    to the decision whether to file a motion to suppress or not.

3          THE COURT:  Overruled.

4     A.    Could you repeat the question, please.

5     Q.    Prior to the District Attorney filing the motion

6    to amend the Information and that motion being granted, did

7    any of the charges against Jim charge him with forcibly

8    performing cunnilingus on Miss Devore?

9     A.    The answer would be no, as long as we are not

10   interpreting sexual intercourse in Counts 1 and 2 in a

11   general sense.

12    Q.    Count 1 charges the rape, correct?

13    A.    Correct.  Which is really not a -- which is really

14   a frontal intercourse charge.

15    Q.    Right.  Indeed, that is the distinction between

16   the rape charge and the IDSI charge.  Is that correct?

17    A.    That's correct.

18    Q.    Rape is actual sexual intercourse, penal/vaginal?

19    A.    Right.

20    Q.    And the IDSI is the charge in Pennsylvania for

21   oral sex.  Is that right?

22    A.    Yes.

23    Q.    Then the sexual assault charge, that was charged

24   as --

25    A.    It says "have sexual intercourse with Lynn

1    Devore".  And I -- I don't have the statute in front of me

2    as to whether or not sexual assault encompasses different

3    types of sexual content.

4        Q.   Once the Judge allowed the Commonwealth to

5    amend -- I believe it was Count 5 of the Information, and it

6    was allowed -- do you recall -- what were they allowed to

7    amend it to charge?

8        A.   Count 5 was -- this was -- the District Attorney

9    explained this as a typo, really; a typographical error, all

10   the way back to the charging officer, I suppose.  But Count

11   5 was supposed to be not with regard to cunnilingus, but

12   with regard to fellatio -- excuse me.  I've got that

13   backwards.  Not with regard to fellatio, but with regard to

14   cunnilingus.  And that was the essence of his motion to

15   amend.

16       Q.   And so by changing it from fellatio to

17   cunnilingus, then what would the actual charge have been?

18       A.   It would still be IDSI, but with regard to

19   cunnilingus during that period.

20       Q.   And this is by force -- by using force?

21       A.   I believe so, yeah.

22       Q.   And once the Commonwealth was allowed -- well, did

23   you try and argue against the Commonwealth being allowed to

24   amend the Information?

25       A.   Yes.

1      Q.   Once that was allowed to be changed, did it ever

2  occur to you that you were now dealing with an explicit

3  charge that charged Jim with forcibly performing cunnilingus

4  on Miss Devore, and that you had a statement from Jim

5  saying, in a sense, yeah, he forced her to allow him to

6  perform oral sex on her, to at that point say, even if I

7  hadn't filed the motion to suppress up till this point, I

8  need to file a motion to suppress to try and keep this

9  statement out?

10      A.   Right.  I -- I see what you're saying.  I would

11  say that, no, those thoughts didn't go through my head at

12  that time.

13      Q.   Now, this is literally as you guys are -- either

14  have started the trial, started picking the jury, or

15  immediately before you're picking the jury.  Is that

16  correct?

17      A.   Yes.

18      Q.   In Crawford County, what would be the normal

19  procedure if -- if the transcripts in this case say that the

20  motion was filed on May 15th of 2000, you guys did your

21  opening statements on May 16th, 2000, if you take my word

22  that May 15th was a Monday and May 16th was a Tuesday,

23  what's the normal process that you guys do in your trial

24  terms down there?

25      A.   I'm kind of lost here, when you were talking about

1   the motion.  Because we usually don't have a motion involved

2   in --

3       Q.   Well, the transcript of the motion proceedings say

4   it was done at 10:00 a.m. on the morning of May 15th.

5       A.   Okay.  If it was a Monday, then normally on

6   Mondays we pick two or three juries.  And the first one or

7   two would be picking juries for trials later in the week.

8   The third jury would be the trial which would begin as soon

9   as we could, which might be opening statements in the

10  afternoon of Monday or opening statements on the morning of

11  Tuesday.

12      Q.   So if the trial -- Jim's trial started with

13  opening statements and stuff on May 16th, which is a

14  Tuesday, then most likely you guys would have been picking

15  the jury on the 15th.

16      A.   Correct.  We almost never pick a jury on Tuesday.

17      Q.   Would there have been grounds, in your opinion,

18  once the Judge allowed the Commonwealth to amend the

19  Information in that way, for you to have said, Judge, even

20  if you're going to allow them to do it, this is now changing

21  this from charging forcible fellatio to forcible

22  cunnilingus; that changes and can change our trial strategy,

23  and I now have to file a motion to suppress the statement,

24  because the statement in there has a -- basically a

25  confession to forcible cunnilingus, and with the changed

1    charge, we now have to raise this?

2        A.    I would say that the answer is, yes, you could

3    certainly make the argument that you now have very good

4    cause to suppress a statement that otherwise the defense had

5    not taken any action to suppress.

6            At the same time, I would probably be very careful

7    of the issue that if the statement was suppressible earlier,

8    and -- then it maybe should have been suppressed earlier,

9    not necessarily that it now becomes an issue simply because

10   of that amendment to the fifth charge.

11           However, I would agree, that would be an argument

12   that I would be quite willing to make to a Judge.

13       Q.    Did you ever even consider making such an

14   argument?

15       A.    No, I didn't.  Like I said, I really did not make

16   the tie of the amended Information and the statement, this

17   bad segment of the statement.

18       Q.    Now, is there any way that you know of that filing

19   a motion to suppress and litigating it could have hurt Jim

20   and put him in a worse position than he was already in?

21       A.    The only situation where that would be the case

22   would be if a statement were favorable in its entirety to

23   the Defendant, and that was not the situation here.

24       Q.    So was there any way that filing a motion to

25   suppress would have hurt Jim's case?

 1        A.   I don't think so.

 2        Q.   In your experience with now practicing -- well,

 3   let me back up and ask this again.

 4             At the time you were handling Jim's case -- Jim's

 5   trial, how long had you been practicing law?  I mean,

 6   actively practicing law.

 7        A.   I practiced about a year and a half out of law

 8   school, took -- you know, I'm now changing my prior

 9   testimony just a little bit.  Took about three years off.

10   Then I'm going to say I got out of graduate school in '97

11   and started practicing law again in the fall of '97.  This,

12   I believe, was '99, 2000.  I had been practicing law for a

13   total of three -- four years.  Not criminal law that whole

14   time.

15        Q.   How much of that time had been devoted to criminal

16   law?

17        A.   Yeah.  When I got -- I didn't do any criminal law

18   during that first year and a half.  After I got out of

19   graduate school, I got a job as a part-time Public Defender

20   somewhere -- I want to say early 1998.  And that's the point

21   where I began practicing criminal law.

22        Q.   And that was the point in time when you were a

23   part-time Public Defender, so you were doing that kind of

24   work part-time.

25        A.   Correct.

1    Q.    And then you had your own --

2    A.    Part-time, but -- but pretty intensely.

3    Q.    And then the rest -- then you also had a private

4    practice on the side.

5    A.    Correct.

6    Q.    Well, that you were --

7    A.    That's correct.  I did criminal defense in my

8    private practice as well.

9    Q.    Okay.  Now, all the charges that have been brought

10   against Jim, they were all felony -- well, other than the

11   simple assault charge, they were all felonies, correct?

12   A.    That's correct.

13   Q.    Had you done a trial before that had -- where

14   someone had been charged with crimes of this magnitude?

15   A.    I had done felony trials.  I believe this was my

16   first sex trial.

17   Q.    Since the time Jim's trial has occurred, have you

18   continued to practice law in Crawford County?

19   A.    Yes.

20   Q.    During that period of time, have you dealt with

21   cases involving -- cases that were investigated by the

22   Meadville Police Department and prosecuted with the

23   assistance of the Meadville Police Department?

24        MR. ERDE:  Objection, Your Honor.  I don't

25   understand the relevance to this case; his future -- or his

1    additional -- additional workload.  We're dealing with what

2    was acceptable behavior then.

3              MR. PATTON:  Within a couple questions I'll be

4    explaining -- you'll see very much how it's relevant to this

5    case and whether Jim was read his Miranda rights or not.

6              THE COURT:  All right.  This is as close as he's

7    got.  So it is overruled.

8         A.   I have dealt with the Meadville Police Department

9    extensively.

10        Q.   Has it been their practice to record their

11   interrogations of suspects in criminal cases?

12        A.   Yeah, it's not unusual.

13        Q.   In your experience, when they have interrogated

14   suspects, if Miranda rights have been given to that suspect,

15   is that normally on the taped part of the statement?

16        A.   I would say that, yes, it is -- it seems to always

17   be on the -- on the tape -- on the taped statement.  The

18   police officer actually reads the person their Miranda

19   rights on the tape.  And I would say that, you know, my

20   recollection on this particular topic that we're talking

21   about right now is very general.  In other words, I'm

22   telling you my general experience, which deals with not only

23   the Meadville City Police Department, but all the other

24   cities and townships and the State Police.  And that seems

25   to be the general practice in Crawford County, when there is

1  a taped statement.

2      Q.   If you had been able to successfully suppress

3  Jim's statement to Officer Trenga, do you believe that would

4  have had an impact on the outcome of the trial?

5      A.   I think so, yeah.  The only thing I'm going to add

6  there is that Jim didn't testify too well.

7      Q.   Well, would it be accurate to say that the

8  existence of this statement and the Commonwealth's ability

9  to use it in their case in chief, that that had an impact on

10 the decision-making process between you and Jim as to

11 whether or not it was necessary for Jim to testify?

12     A.   In hindsight.  However, I think that in

13 approaching this case, I would have -- if I have a victim

14 who is making strong accusations, I truly believe I would

15 have put Jim on the stand or I would have put my Defendant

16 on the stand to respond.  In hindsight, I probably wouldn't

17 have put Jim on the stand, only because his testimony was

18 not as good as I really wanted it to be.

19     Q.   Even though Jim's testimony wasn't as good as you

20 wanted it to be, was Jim convicted of raping Miss Devore?

21     A.   No, he wasn't.

22     Q.   Was he convicted of sexually assaulting

23 Miss Devore?

24     A.   No, I don't think he was.

25     Q.   Was he convicted of the involuntary deviate sexual

1    intercourse charge that charged him with having her perform

2    fellatio by the use of the threat of forcible compulsion?

3         A.   No.  He was acquitted of those charges.

4         Q.   So every sex charge, other than the IDSI

5    cunnilingus charge, the jury found Jim not guilty.

6         A.   That's correct.

7         Q.   And would it be fair to say that the only thing

8    that distinguished the cunnilingus charge from the other sex

9    charges was this portion of Jim's statement that we had

10   talked about before?

11        A.   Well, I will grant you that this portion of the

12   statement was very damaging for Jim.  However, his testimony

13   didn't help, as I recall.

14        Q.   All right.  But his testimony didn't prevent the

15   jury from finding him not guilty of all the other sex

16   charges in the information, correct?

17        A.   That's correct, yes.

18        Q.   Now, he was found guilty of simple assault, but is

19   it fair to say that was not based on sexual --

20        A.   That was almost an entirely different issue.

21        Q.   That had to do with Jim grabbing --

22        A.   That's right.

23        Q.   -- Miss Devore by the hair --

24        A.   Yeah.  That was a different point in time in that

25   weekend, and I think we may have even consensually conceded

1    that.

2                (Discussion held off the record.)

3        Q.    Is it accurate to say that had the statement been

4    suppressed, you feel your case may have been stronger?

5        A.    Absolutely.

6        Q.    And that the Commonwealth's case would have been

7    weaker?

8        A.    Yes.

9        Q.    So that Jim -- would it be fair to say that Jim

10   would have benefited from having the motion -- or, excuse

11   me, the statement suppressed?

12       A.    Yes.

13       Q.    And is it accurate to say that had you filed the

14   motion to suppress, litigated it, and lost, Jim would have

15   been no worse off than he would have been without the motion

16   being filed?

17       A.    Yes.

18       Q.    So that the filing of the motion would have in no

19   way hurt him, and there was no potential downside to filing

20   the motion.  Is that correct?

21       A.    Correct.

22       Q.    So the decision not to file a motion to suppress

23   was not motivated by any fear that if you filed it, somehow

24   something might come up that would hurt Jim's case and make

25   him worse off.

1    A.    That is correct.  Although I always have a certain
2  degree of fear that in a suppression hearing, my Defendant
3  is going to take the stand and say something that could hurt
4  us at trial and could be used against us at trial, and I
5  always take that into consideration.  And, however, under
6  these circumstances, that wouldn't have stopped me.
7    Q.    So the fear that Jim might have said something at
8  the suppression hearing that was hurtful would not have
9  prevented you from filing the motion.
10    A.    In a -- no.  Not in this case, it wouldn't have
11  prevented me.
12    Q.    But you do have a general fear that if you file a
13  motion to suppress, some -- and if you put your client on
14  during the motion to suppress, they may say something that
15  can be used at trial to hurt you?
16    A.    It's enough of a fear that I take it into account
17  and weigh it against what I have to gain.  Under these
18  circumstances, what I had to gain would have been
19  substantial.
20    Q.    It would have been substantial enough that --
21    A.    To outweigh fear.
22    THE COURT:  Mr. Patton, the closer my stomach gets
23  to lunch, the more your plodding and sort of
24  repetitive-style -- that's the concern.  So why don't we
25  move it along.

```
 1              MR. PATTON:  Okay.
 2    BY MR. PATTON:
 3         Q.   After the trial was over and -- did you have some
 4    correspondence with Jim about whether or not an appeal would
 5    or would not be filed?
 6         A.   Yes.
 7         Q.   I'll show you Plaintiff's Exhibit 1 and have you
 8    take a look at that.
 9         A.   (Witness complies.)  Okay.
10         Q.   Is that a letter you sent to Jim regarding, in
11    general, appeals or a possible Post-Conviction Relief Act
12    Petition?
13         A.   Yes.
14         Q.   And in that letter, do you reference --
15    specifically in the first paragraph, when we're talking
16    about potential appeal issues -- the fact that Jim had
17    mentioned to you on a number of occasions that he had not
18    been read his Miranda rights?
19         A.   What I said was, "You have mentioned in the past
20    that you did not receive your Miranda rights."
21         Q.   And then the letter goes on to say that that was
22    something that he may want to raise on a PCRA petition.
23         A.   That's correct.
24         Q.   And as you testified earlier, that you had
25    discussions with Jim sometime before trial about him -- Jim
```

1    saying that he had not been read his Miranda rights by

2    Trenga.

3        A.    Yeah.  I barely recall it, but I -- I would agree.

4        Q.    And as you mentioned, you had Trenga's report in

5    the discovery.

6        A.    Correct.

7        Q.    Correct?  And, now, would it be fair to say, in

8    your experience as an attorney, that before the -- well, let

9    me ask you, do the police have to read somebody their

10   Miranda rights anytime the police ever talked to somebody?

11       A.    No.

12       Q.    Is there some condition that has to exist first

13   for the requirement of Miranda rights to be triggered?

14       A.    That's right.

15       Q.    And what is that?

16       A.    Custody or detention.

17       Q.    Now, in Officer Trenga's report, does it indicate

18   that when they first went to Jim's apartment and asked him

19   if he wanted to speak to them, does it indicate what Jim

20   said to them?

21       A.    Yeah.

22       Q.    What does it say?

23       A.    It says, "Upon arrival at Hodson's, he said he

24   wanted to go to bed, and I told him that it was important

25   that I talk to him and that I would be brief.  Hodson then

1  agreed and we transported him to the station."

2      Q.   In your opinion, based on the information in that

3  police report, would you have felt comfortable, if you filed

4  a motion to suppress in this case, arguing that Jim was

5  subjected to custodial interrogation by Officer Trenga?

6      A.   Well, just by that short description, I don't

7  think I would have had enough information as to whether or

8  not he was in custody.

9      Q.   If Jim had told you that when Trenga showed up and

10 asked to speak with him, Jim told him that he was tired and

11 wanted to go to bed, but Trenga said, no, it's important, I

12 need to speak with you, and wanted Jim to come down to the

13 police station, would you have felt comfortable in filing

14 the motion and arguing that Jim was subjected to custodial

15 interrogation?

16     A.   I don't recall what Jim told me.

17     Q.   Okay.

18     A.   What you're asking me is hypothetical.  I'm not

19 sure what my answer would -- would be.  I mean, there were

20 other things too.  Because I also talked to the D.A. and

21 talked to the police officer.  Not the D.A.  The D.A.'s

22 input on that particular issue was not important to me.  I

23 did talk to the police officer.

24     Q.   You talked to Trenga?

25     A.   I believe I talked to Vince.  Either that, or I

1    talked to -- Vince Trenga.  Either that, or I talked to Greg

2    Gump.  One, but I don't know which.

3        Q.   You don't know which one of those two you would

4    have talked to about the case?

5        A.   That's correct.  What I talked to them about was

6    specifically this -- the Miranda rights.

7        Q.   And --

8        A.   And I may have talked to them about custody too,

9    because that was certainly an issue here.

10        Q.   And what did they tell you about --

11        A.   I don't remember what they said about -- I -- it

12    was a long time ago, and my best recollection is -- is not

13    good with regard to custody.  Not good enough for me to tell

14    you what they told me.

15        Q.   Okay.

16        A.   I do recall that they said that they -- whoever I

17    was talking to said that he did sign a waiver, and that's

18    all I remember of the conversation.

19        Q.   And you never received the waiver.

20        A.   That's correct, yeah.

21        Q.   And if you file a motion to suppress, arguing that

22    a statement was taken from a person in violation of their

23    Miranda rights, who has to prove up that the person actually

24    received their Miranda rights?

25        A.   The Commonwealth.

1      Q.    So that's their burden to prove that it actually
2   happened.
3      A.    That's right.
4      Q.    And you knew before the trial started that they
5   did not have in their possession a waiver form from Jim
6   waiving his Miranda rights.
7      A.    Not that they could locate.
8            MR. PATTON:  Those are my questions, Your Honor.
9            THE COURT:  Thank you.  Cross-examination.  How
10  long?  Any estimate?
11           MR. ERDE:  20 minutes, hopefully.
12           (Discussion held off the record.)
13
14                   CROSS-EXAMINATION
15  BY MR. ERDE:
16
17     Q.    Based on your conversations with either Detective
18  Gump or Officer Trenga, did you form a determination as to
19  whether or not there was a legitimate suppression issue
20  regarding Miranda?
21     A.    I formed an opinion that suppression would be very
22  difficult.
23     Q.    And you stated that at trial, Mr. Hodson testified
24  poorly, I think was the term you used.  Or not as well as
25  you would have hoped.

1        A.    Yeah.  Generally, that's correct.

2        Q.    Was his testimony consistent with the statement

3   that he provided to Officer Trenga on the night that he

4   provided the statement?

5        A.    I think it was.  I think -- I think it was

6   somewhat waivering when -- just like the taped statement.  I

7   think it was somewhat waivering when you got down to was it

8   force or was it not.  It was -- his testimony was not really

9   very adamantly against force.

10       Q.    You couldn't know how he would testify until it

11  went to trial.

12       A.    I could have, to some degree.  I mean, you talk to

13  your clients.  Some attorneys even practice testimony, I

14  suppose.  I didn't.  I never do much.  Don't have time.

15  Didn't then.

16       Q.    But it was your trial strategy all along to have

17  him testify.

18       A.    Yes.

19       Q.    And that was based on the nature of the charges?

20       A.    Yes.  No, it was based on -- yeah, the -- the

21  facts, the nature of the victim's word against the

22  Defendant's word, and that there was really no other

23  substantial physical evidence.

24       Q.    If you had filed a motion to suppress -- and it's

25  the Commonwealth's burden, as you already testified to --

1    what is the threshold or the standard by which the

2    Commonwealth has to prove its case of suppression?

3        A.    I think by a preponderance of the evidence.

4        Q.    More likely than not?

5        A.    Yeah.

6        Q.    And you had already talked with Officer Trenga or

7    Detective Gump, and they had already told you, yes, we read

8    him his Miranda --

9        A.    One of those two talked to me.  I had actually

10   asked them.

11       Q.    And they had indicated Miranda was provided?

12       A.    Yes.  This was after -- I mean, for the longest

13   time I was expecting it to just show up in the mail, because

14   I had requested it, and Assistant District Attorney Schwartz

15   says it's coming.  Then after Mr. Schwartz indicated that

16   they just can't find it, I had a conversation with one of

17   those two and talked to them to kind of gauge their position

18   and gauge how credible it would be.

19       Q.    If Officer Trenga said I absolutely read him the

20   Miranda, I had him sign a Miranda, the suppression would

21   likely be denied.

22       A.    Yes.

23       Q.    In light of Count 5 being amended from fellatio to

24   cunnilingus, do you think that would have any impact on a

25   Court's determination on whether or not to grant a motion to

1    suppress?

2        A.    Not whether or not the Court would grant a motion

3    to suppress, no.  I think it would be completely irrelevant

4    to that issue.  It would be quite relevant to whether or not

5    they would entertain a motion.

6        Q.    Sure.  Under timeliness issues.  If you then said,

7    Your Honor, I understand this is beyond the 30 days, they

8    would entertain it for that purpose, you mean?

9        A.    Possibly, yes.

10       Q.    Okay.  You had contemplated a suppression motion

11   prior to the trial, though, correct?

12       A.    Yes.

13       Q.    And based on the thought process, you determined

14   that the suppression motion was not a legitimate motion to

15   file.

16       A.    I -- it's very difficult for me to remember, but I

17   would say that I determined that the motion was not strong

18   enough to pursue.

19           MR. ERDE:  I have no further questions.

20           THE COURT:  Thank you.  Mr. Patton.

21

22                    REDIRECT EXAMINATION

23   BY MR. PATTON:

24

25       Q.    Your decision about the relative strength or

1    weakness of the motion to suppress, would it be accurate to

2    say it was based on you talking to either Officer Trenga or

3    Officer Gump?  Is that correct?

4         A.    That would be -- yes, that's part of it.  That

5    would be some of the information I used to reach that

6    conclusion.

7         Q.    So based on their statement, your thought process

8    was them saying, yeah, we really Mirandized him, and then

9    deciding whether or not you thought you could win a motion

10   to suppress with that kind of testimony?

11        A.    Yeah.  That, and also there may have been a

12   question in my mind as to whether or not he was in custody.

13   I know that that one is close.  But I thought that that was

14   also an issue.

15        Q.    Had you concluded that filing a motion to suppress

16   would have been frivolous?

17        A.    No.  No, it would not have been frivolous.

18        Q.    And so how would it have been harmful to Jim for

19   you to file the motion and litigate it?

20        A.    It would not.

21              MR. ERDE:  It's beyond the scope.

22              THE COURT:  It's also asked and answered before.

23        Q.    With the change in the charge that we discussed,

24   did that change -- in your opinion, change the harmfulness

25   of Jim's statement?

1      A.    Your question is did it?

2      Q.    Right.

3      A.    And my answer would be I did not connect the

4   amendment to the charges to his statement, to the way you

5   are today.  Today, I would agree with you.

6            MR. PATTON:  Those are my questions, Your Honor.

7            THE COURT:  Anything else, Mr. Erde?

8            MR. ERDE:  No, Your Honor.

9            THE COURT:  Thank you for your testimony.  You are

10  excused.

11           THE WITNESS:  Certainly.  Thank you.

12           THE COURT:  You have one more witness.  Is that

13  correct, Mr. Patton?

14           MR. PATTON:  I have no more witnesses, Your Honor.

15           THE COURT:  No more witnesses?

16           MR. PATTON:  No.

17           THE COURT:  What is your plan?

18           MR. ERDE:  I have Officer Trenga to call, and I

19  want to speak with Detective Gump during the break to

20  determine whether or not it would just be duplicative and

21  cumulative or if there is potential --

22           THE COURT:  All right.  Then we will --

23           (Discussion held off the record.)

24           THE COURT:  How about we start back at 2:15.

25           (Recess held from 12:18 p.m. till 2:23 p.m.)

1          THE COURT:  Okay, Attorney Erde.

2          MR. ERDE:  Commonwealth calls Vince Trenga.

3

4      V I N C E N T  S.  T R E N G A, first having

5      been duly sworn, testified as follows:

6

7          THE CLERK:  State your full name and spell your

8  last name for the record.

9          THE WITNESS:  Vincent Santino Trenga, T-R-E-N-G-A.

10

11                      DIRECT EXAMINATION

12  BY MR. ERDE:

13

14      Q.    Officer Trenga, how long have you been a member of

15  three Meadville Police?

16      A.    I'm in my 10th year.

17      Q.    Calling your attention to June of 1999, were you

18  involved in an investigation regarding -- involving Jim

19  Hodson?

20      A.    Yes.

21      Q.    What was the nature of the allegations?

22      A.    That a Lynn Devore was at the Meadville Medical

23  Center and allegedly was reporting that she was held captive

24  and raped by the Defendant.

25      Q.    Based on -- did you interview Miss Devore?

1      A.    Yes.

2      Q.    Based on your interview of Miss Devore, what did

3  you do as far as following up the investigation?

4      A.    I was able to make contact with the Defendant and

5  bring him to the station to talk to him.

6      Q.    How did you first make contact with the Defendant?

7      A.    I called his house, and there was no response, and

8  I called him again later.  It was about 1:00 a.m.  He

9  answered, and I asked him if he would mind talking --

10  talking to me.  And he said he was kind of tired -- or at

11  first he said, is this in reference to Lynn and the pills,

12  and then the phone went dead.

13      Q.    What did you do at that time?

14      A.    I -- myself and Detective Gump went to his

15  residence.

16      Q.    When you got there, what did you do?

17      A.    I again told him -- asked him if he would mind

18  talking to us.

19      Q.    Did you identify yourself as a police officer?

20      A.    Yes.  Yes.  I was in full uniform.  And I asked

21  him if he would mind talking to us.  He said he was tired,

22  and I said it was kind of important.  I told him he wasn't

23  under arrest; he was going to be free to go, and I just

24  would appreciate it if he would come down to station and

25  talk to us.

1       Q.   Did he agree to go with you?

2       A.   Yes.

3       Q.   How many times while you were in his apartment or

4 residence did he indicate that he was tired and wanted to go

5 to bed?

6       A.   Once, that I can recall.

7       Q.   After you told him that it was important --

8       A.   Yes.

9       Q.   -- he agreed to go?

10      A.   Yes.

11      Q.   How did he get to the station?  Do you recall?

12      A.   We transported him.  We -- we all walked out to my

13 cruiser.  I told him the standard procedure and asked him if

14 he had anything on him.  Just patted him down.  We didn't

15 place any handcuffs on him.  Just, you know, told him to

16 have a seat in the back of the car, and we transported him

17 to the station.

18      Q.   He was not handcuffed when you brought him back to

19 prison [sic]?

20      A.   No, he was not.

21      Q.   Why did he end up being transported in the

22 cruiser?

23      A.   It was just the only transportation I could

24 provide; just for him to come along with us.  I don't

25 think -- he said he didn't have a way down there.

1       Q.    When he got to the station, do you recall where he

2   went?

3       A.    Yeah.  We went to a back patrol office.

4       Q.    Who is "we"?

5       A.    Myself and Detective Gump and the Defendant.

6       Q.    At that time was he placed under arrest?

7       A.    No.

8       Q.    When you went into that back room, who all went in

9   it?

10      A.    Myself and the Defendant, and Detective Gump came

11  in briefly and then left.

12      Q.    Did you ask him any questions at that point?

13      A.    The Defendant?

14      Q.    Yes.

15      A.    No, I didn't.

16      Q.    When Detective Gump left, where did you go?

17      A.    I stayed there with the Defendant.  Immediately I

18  informed him that he was not under arrest and he was free to

19  go whenever he wanted.

20      Q.    Did you ever read him Miranda warnings?

21      A.    Yes, I did.

22      Q.    Did you ever provide him with a Miranda waiver

23  form?

24      A.    Yes, I did.

25      Q.    Did he sign that form?

1          A.    Yes.

2          Q.    Prior to Miranda, your reading him Miranda, the

3     form, did you leave the room?

4          A.    Yes.

5          Q.    For what purpose?

6          A.    To talk to the detective.

7          Q.    And when you came back in, that was when you read

8     him Miranda?

9          A.    (No response.)

10         Q.    Do you recall if you read Miranda prior to or

11    after --

12         A.    No.  I misunderstood your question.  I explained

13    to him that he was not under arrest, and I probably left the

14    room to get the form, came back, and then read him his

15    rights.

16         Q.    Did he sign the form?

17         A.    Yes.

18         Q.    Did you conduct an interview with him --

19         A.    Yes.

20         Q.    -- at that time?

21         A.    Yes, I did.

22         Q.    Was he placed under arrest prior to the interview?

23         A.    No.

24         Q.    Did you tape-record the interview?

25         A.    Yes.

1      Q.   Did you request his permission or consent prior to
2  tape-recording it?
3      A.   Yes.
4      Q.   Did he consent?
5      A.   Yes, sir.
6      Q.   Do you have a copy of this Miranda waiver form
7  that he signed?
8      A.   No, I do not.
9      Q.   Do you know where it is?
10     A.   No, I do not.
11     Q.   Do you specifically remember him signing the form?
12     A.   Yes.
13     Q.   In your presence?
14     A.   Yes.
15     Q.   Do you know where the form is?
16     A.   No.  From my understanding, it was misplaced
17  somewhere, maybe by a secretary.
18     Q.   After signing the form, you conducted the
19  interview.
20     A.   Yes.
21     Q.   At any point did he indicate that he wished to end
22  the questioning?
23     A.   Yes.
24     Q.   Was it all questioning?
25     A.   Excuse me?

1      Q.   Did he wish to end all questioning, or just
2  specific questioning?
3      A.   Specific questioning.
4      Q.   In regards to what?
5      A.   Sexual.  He didn't want to talk about any more
6  sexual questions.
7      Q.   And, again, this is involving Miss Devore?
8      A.   Yes.
9      Q.   Did you comply with his request?
10     A.   Yes.
11     Q.   At some point did he ask whether or not you could
12  cease tape-recording the interview?
13     A.   Yes.
14     Q.   Did you comply with his request?
15     A.   Yes, I did.
16     Q.   How would you describe his demeanor during the
17  interview?
18     A.   It was very carefree.  There was occasional
19  laughing.  It was just kind of -- almost kind of cocky.  He
20  just kind of lounged back in his seat and just appeared to
21  be carefree.
22          (Discussion held off the record.)
23     Q.   I'm going to hand you what's been labeled
24  Plaintiff's Exhibit 6.  And it's been admitted as -- or a
25  representation memorializing the taped interview.  I'm going

1   to ask you that you turn to Page 3.

2        A.    (Witness complies.)

3        Q.    About two-thirds of the way down.  You indicate --

4   or you ask the question, "Like a peck, or was it like a -- a

5   kiss or --" what was his response?

6        A.    He just laughed.

7        Q.    Was it a nervous laugh?

8        A.    No.

9        Q.    Turning to Page 8, about a third of the way down,

10  you ask him a question to which he responded, "My cheat --"

11  you say, "Oh."  He says, "Cheater," laughs, and, "I don't

12  recall saying."  "You were kind of ticked off?"  "Yeah."

13        When he laughed there, do you recall his demeanor?

14        A.    Just, like I said, kind of cocky, carefree.

15        Q.    Page 10, about a quarter of the way up, there's

16  another sign -- or another line indicating laughter.  His

17  demeanor at that point, do you recall what it was?

18        A.    The same.

19        Q.    And Page 13, the third line from the top, he says,

20  "I don't see what eating has to do with it (chuckles)."

21        Again, what was his demeanor, if you recall?

22        A.    The same as before.

23        Q.    Is it fair to say that during the entire

24  interview, his demeanor was relaxed and lighthearted?

25        A.    Yeah.  On both ends, as far as the way I was

1    talking to him as well.

2        Q.    At any point during the interview, based on your

3    training, experience, and education, did the Defendant

4    appear to be unaware of what was going on?

5        A.    He seemed like he was fully aware.  Very coherent

6    and responded to everything.  I thought it was proper.

7        Q.    His responses to the questions were appropriate?

8        A.    Yes.

9        Q.    Did he appear to be under the influence of

10   alcohol?

11       A.    If he was, it was nothing to a degree that I

12   thought would interfere with his -- his answers.

13       Q.    Any sort of controlled substance?

14       A.    Not that I could see out of the ordinary.

15       Q.    At the conclusion of the interview, what did you

16   do with Mr. Hodson?

17       A.    Took him home.

18       Q.    At any point during the interview was he in

19   custody?

20       A.    Never.

21       Q.    Was he always free to leave?

22       A.    Yes.

23       Q.    Did you ever indicate to him other than the

24   Miranda warnings that he was not free to leave?

25       A.    No.  I reiterated that he was free to leave, he

1    was not under arrest.  He sat in the office with open doors,

2    and it was a very relaxed environment.

3        Q.    A few days later, did he attempt to make contact

4    with you?

5        A.    Yes.  I was informed by our detective then, Dave

6    Stefanucci, that Mr. Hodson had called and asked for me and

7    wanted to relay that he wanted me to be aware that he --

8    when he was having sex with Miss Devore during that weekend,

9    he wanted me to know that her brother walked in on them.

10   And then he said if I had any questions about that or

11   anything else, to get a hold of him whenever.

12       Q.    Now, looking at the taped statement, nowhere in it

13   is there anything memorializing you having read him his

14   Miranda warnings.  At the time of the statement, which was

15   Monday, June 21st, 1999, was it standard procedure to

16   audio-tape the Miranda warnings?

17       A.    No.

18       Q.    Is it now?

19       A.    No.

20           MR. ERDE:  I have no further questions at this

21   time, Your Honor.

22           THE COURT:  Thank you.  Cross-examination.

23

24                        CROSS-EXAMINATION

25   BY MR. PATTON:

1      Q.   Officer Trenga, on June 20, you interviewed
2  Miss Devore.  Is that correct?
3      A.   Yes, sir.
4      Q.   And she had made allegations that Mr. Hodson had
5  raped her?
6      A.   Yes, sir.
7      Q.   What time did that occur?  Your discussion with
8  Miss Devore.
9      A.   What time did I speak to her?
10     Q.   Yes.
11     A.   I believe it was 3:00 p.m.  Around that time.
12  Just somewhere in the afternoon.
13     Q.   After that was done, you tried to get in touch
14  with Mr. Hodson?
15     A.   Yes, sir.
16     Q.   By calling his -- by calling him?
17     A.   Yes, sir.
18     Q.   But he was not home?
19     A.   Yes.
20     Q.   Did you leave a message?
21     A.   I can't exactly recall.  I believe there was even
22  a time between like around 11:00 that I stopped by, and he
23  was not home.
24     Q.   So you called his house, and he wasn't home.  You
25  went by his house, and he wasn't home.

1       A.    Right.

2       Q.    How many more times did you call his home?

3       A.    That's it.  That I can -- I think the second time

4    I talked to him -- or called is when he answered.

5       Q.    And approximately what time of day was that?

6       A.    That was 1:00 a.m.

7       Q.    Okay.  So it's 1:00 in the morning, and you call

8    him and tell him that you want him to come to the station to

9    talk about Lynn Devore, correct?

10      A.    Yes, sir.

11      Q.    And he asked you if this had to do with Lynn and

12   the pills, correct?

13      A.    That's what he earlier said on the phone.

14      Q.    Well, you only talked with him on the phone one

15   time, correct?

16      A.    Yes, sir.

17      Q.    So you call him at 1:00, and he answers, and you

18   tell him that you want him to come down to the police

19   station so that you can talk to him.  Correct?

20      A.    Yes.

21      Q.    And he asks you if this had to do with Lynn and

22   the pills, correct?

23      A.    Yes.

24      Q.    And then the phone just went dead.

25      A.    Yes, sir.

1        Q.    So you decided that you were going to drive to

2   Mr. Hodson's apartment.

3        A.    Yes.

4        Q.    At 1:00 in the morning.

5        A.    Yes.

6        Q.    Because you wanted to talk to him.

7        A.    Correct.

8        Q.    And you wanted to speak to him that night.

9        A.    Yes.

10       Q.    You didn't want to wait until the next day.

11       A.    No.

12       Q.    You felt it important to speak with him that

13  night.

14       A.    I can't remember the circumstances as far as if I

15  even worked the next day.  That could have been one of the

16  reasons why I wanted to do it then.

17       Q.    Well, so you drive to his house at 1:00 in the

18  morning.

19       A.    Yes.

20       Q.    With, at the time, Officer Gump?

21       A.    Yes, sir.

22       Q.    Both in full uniform?

23       A.    Yes.

24       Q.    You are both in a marked police cruiser?

25       A.    Yes.

1      Q.   So when you get to his house, it is after 1:00,
2    correct?
3      A.   Yes, sir.
4      Q.   You knocked on the door, and Jim answers in just
5    his underwear.  Correct?
6      A.   I don't recall what he was wearing.
7      Q.   When he opened the door, you and Officer Gump
8    stepped into his apartment.  Correct?
9      A.   Yes.
10     Q.   And you told him that you wanted to speak to him
11   about Lynn.  Correct?
12     A.   I wanted to speak to him about what happened this
13   past weekend.
14     Q.   And that you wanted to do that at the police
15   station.
16     A.   Yes, sir.
17     Q.   Now, at 1:00 in the morning, right?
18     A.   Yes.
19     Q.   And Jim tells you that he's tired and he just
20   wants to go to bed.  Correct?
21     A.   Correct.
22     Q.   Indicating that he does not want to go down to the
23   police station to talk to you, because he's tired and he
24   wants to go to bed.  Correct?
25     A.   Yes.

1      Q.   But you did not accept his statement that he just
2  wanted to go to bed.  You didn't leave after that, did you?
3      A.   No.  I just said it was important.
4      Q.   You didn't leave after he told you that he just
5  wanted -- that he was tired and he just wanted to go to bed,
6  did you?
7      A.   Yeah.  I just asked him one more time.
8      Q.   Because you wanted to speak with him that night,
9  correct?
10     A.   Yes, sir.
11     Q.   And you wanted to impress upon him that you wanted
12  to speak with him that night.  Correct?
13     A.   Yes.
14     Q.   You would agree with me that when Jim said he was
15  tired and he wanted to go to bed, that, in effect, he was
16  saying to you that he did not want to go down and speak with
17  you at the police station.  Correct?
18     A.   No.  It wasn't very convincing.
19     Q.   It wasn't convincing that he said he was tired and
20  wanted to go to bed.
21     A.   Correct.
22     Q.   So you didn't think he really wanted to go to bed.
23     A.   I just thinking -- I just thought he was avoiding
24  me.
25     Q.   He didn't want to talk to you.

1          A.    I don't know.

2          Q.    Well, as you said, you just thought he was trying

3     to avoid you.  Correct?

4          A.    Yes.

5          Q.    Because he didn't want to speak with you.

6     Correct?

7          A.    For whatever reason.  I don't know.

8          Q.    Well, you were telling him that the reason you

9     wanted him to come with you was so you could question him.

10    Right?

11         A.    I wanted him to tell me about this weekend.

12         Q.    And he said no, he wanted to go to bed.  Correct?

13         A.    He didn't say no.

14         Q.    Well he said --

15         A.    He said, I'm tired.

16         Q.    -- he was tired and he wanted to go to bed.

17    Correct?

18         A.    Yes.

19         Q.    You believed he was just trying to avoid you;

20    avoid speaking to you, correct?

21         A.    He just didn't want to talk about what happened, I

22    guess.

23         Q.    And so at that point in time you did not accept

24    that and say, okay, you don't want to talk to me, I'll

25    leave.  You did not do that, correct?

1      A.    Correct.

2      Q.    You told him, it's very important and that you

3   wanted to speak with him, correct?

4      A.    Yes, sir.

5      Q.    To impress upon him that it was important that you

6   speak to him.  Right?

7      A.    It wasn't very authoritative.

8      Q.    Well, it's 1:00 in the morning, right?

9      A.    (No response.)

10     Q.    Correct?

11     A.    Yes, sir.

12     Q.    You and Officer Gump are standing in his

13   apartment.  Correct?

14     A.    Yes.

15     Q.    Both of you in full uniform.  Correct?

16     A.    Yes.

17     Q.    And you have told Jim that you wanted him to come

18   to the police station to talk with you; to talk about what

19   happened over the weekend.  Correct?

20     A.    Yes.

21     Q.    He has told you he wants -- he's tired, and he

22   wants to go to bed.  Correct?

23     A.    Yes.

24     Q.    To avoid talking to you.  Correct?

25     A.    Yes.

1      Q.    To avoid answering your questions.  Correct?

2      A.    I don't know exactly.  I can't speak why.

3      Q.    Well, he didn't want to speak to you, though,

4  correct?

5      A.    I don't know if that's what he was implying.

6      Q.    And you -- but then went ahead and told him, it's

7  important; I want to speak to you.  Correct?

8      A.    Yes.

9      Q.    While you and Officer Gump are standing in his

10  apartment in your uniforms at one in the morning.

11      A.    Correct.

12      Q.    Jim told you he had been drinking; that he

13  couldn't drive himself down to the station?  Correct?

14      A.    I believe there was something like that said.

15      Q.    You told him that that wasn't a problem; that you

16  would take him.  Correct?

17      A.    Yes.

18      Q.    When Jim told you that he had been drinking, he

19  couldn't drive himself down to the station, you knew -- it

20  was just a further attempt on his part to avoid talking to

21  you.  Correct?

22      A.    Not at all.

23      Q.    And so you told him you would take him down.

24  Correct?

25      A.    Yes.

1       Q.    So he's told you he doesn't want to talk -- he

2   wants to go to bed.  You've told him -- you don't leave at

3   that point.  You tell him it's really important; that you

4   want to talk with him.  He said that he can't drive himself

5   down to the station because he's been drinking, and then you

6   say that you will drive him.  Correct?

7       A.    Correct.

8       Q.    And it's only at that point that Jim says, I'll

9   go.  Correct?

10      A.    Correct.

11      Q.    And you take him outside to your marked police

12  cruiser.  Is that right?

13      A.    Yes.

14      Q.    Before you put him in the police cruiser, you pat

15  him down.  Correct?

16      A.    Yes, sir.

17      Q.    To make sure he doesn't have any contraband on

18  him.

19      A.    Yes, sir.

20      Q.    And put him in the back of the car.  Is that

21  right?

22      A.    Correct.

23      Q.    In your police cruiser, the back doors of that

24  cruiser can not be opened from the inside of the vehicle,

25  correct?

```
 1        A.    Correct.

 2        Q.    And you drive him down to the police station.  Is

 3   that right?

 4        A.    Yes, sir.

 5        Q.    And you pull your car into the sallyport of the

 6   police station.  Is that correct?

 7        A.    Yes, sir.

 8        Q.    And then to get in that sallyport, it's got an

 9   automatic door on it, right?

10        A.    Yes, sir.

11        Q.    So get in, you put the door up, and once you drive

12   the car in, you put the door down.  Correct?

13        A.    Yes, sir.

14        Q.    You can't get out unless you have access to the

15   keys to get out.  Correct?

16        A.    No, there's exits all through the police

17   department.

18        Q.    Well --

19        A.    As well as a button push from the inside.

20        Q.    You stayed with Jim -- you and Officer Gump

21   accompanied Jim into the police station.

22        A.    Correct.

23        Q.    Walk him down the hall to the detective's room.

24   Is that what you referred to it as?

25        A.    No.  It was a police officer room.  It was a
```

1    patrol room.

2         Q.    Patrol.  And you put Jim in there and told him to

3    have a seat.  Correct?

4         A.    Yes, sir.

5         Q.    You and Gump both, then, leave the room, correct?

6         A.    No.  The first thing I did was explain to him that

7    he wasn't under arrest.

8         Q.    You tell him that he's not under arrest.

9         A.    Yes, sir.

10        Q.    Those were your exact words.

11        A.    Correct.

12        Q.    Okay.  You then leave.  Correct?

13        A.    Yes.

14        Q.    And Gump leaves as well, correct?

15        A.    Yes.

16        Q.    And you then come back.  Correct?

17        A.    Yes.

18        Q.    Gump does not come back with you.

19        A.    Correct.

20        Q.    And when you come in, you have a recorder,

21    correct?  Tape recorder.

22        A.    Not at this time.  When I came in this time, I

23    brang in the form.

24        Q.    You had a Miranda form.  You didn't have that form

25    on you before.

1          A.    No, sir.

2          Q.    Where did you get the form from?

3          A.    It's one office over.

4          Q.    And you say that you gave this form to Jim.

5          A.    Correct.

6          Q.    You gave it to him?

7          A.    I read him word for word of the Miranda rights.

8    He stated and signed that he understood his rights.  And

9    then there's a paragraph saying that he wants to talk to me

10   on his own free will without an attorney present.

11         Q.    What do you do with that form, then?

12         A.    I just set it to the side.  I --

13               (Witness asked for clarification by the reporter.)

14         A.    I set it to the side.

15         Q.    You said it goes into the file, correct?

16         A.    Correct.

17         Q.    So you created a file for -- that went with this

18   investigation?

19         A.    I just put my paperwork, what I have, I set it in

20   a -- in a box that's out in another office for the

21   secretary.

22         Q.    Well, what are the normal procedures that are used

23   to preserve that form?

24         A.    That's as normal as it gets.

25         Q.    Where does the secretary put it?

1      A.    She takes it upstairs to her office.

2      Q.    Do you guys open a file for each investigation

3  that you're doing?

4      A.    She would do that.

5      Q.    So there would be some file in the Meadville

6  Police Department for what is identified by Jim's name or by

7  the victim's?

8      A.    It's identified by Jim's name.

9      Q.    And after you had talked with Miss Devore and

10  decided you were going to -- you received this report of

11  this crime and started an investigation, would you have

12  started up a file for an investigation of Jim with regard to

13  these charges?

14      A.    It's not up to me to start the file.  I just

15  collect my paperwork, hand it to the secretary, and she does

16  what she does with it.

17      Q.    Well, how do you write your report?

18      A.    On a computer.  And it's just -- it saves, and

19  then it's -- it's up to her to print it out and attach it

20  with the rest of the paperwork.

21      Q.    When was the last time you saw this Miranda waiver

22  form?

23      A.    I have no idea.  That night would probably be a

24  fair --

25      Q.    You've never seen it since then?

1          A.    Probably at -- at the next court proceeding.

2          Q.    Well, what was the next court proceeding?

3          A.    I don't know if it was the prelim., trial.

4          Q.    Why would you have seen it at a prelim.?

5          A.    I'm sorry?

6          Q.    Why would you have seen it at a prelim.?

7          A.    Because I would have had the whole file in front

8    of me.

9          Q.    Where are the files kept?

10         A.    Upstairs in the secretary's office.

11         Q.    So if you have to go to a court hearing, you just

12   go up and you take the file for the particular defendant in

13   question?

14         A.    Yes, sir.

15         Q.    And did you testify at the preliminary hearing in

16   this case?

17         A.    I can't recall.

18         Q.    You taped the statement of Jim the morning of the

19   21st.  Is that correct?

20         A.    Yes, sir.

21         Q.    On the tape, as you already testified, you didn't

22   tape-record your giving the Miranda warnings to Jim.

23   Correct?

24         A.    Correct.

25         Q.    Why not?

1          A.    Just choose not to.

2          Q.    Why?

3          A.    I didn't think it was necessary at the time.

4          Q.    Well, why did you record Jim's statement?

5          A.    So I could go back and be easier for me to put it

6     on -- in a supplement and just to -- be easier to listen

7     for -- for everybody to listen to how to conversation was,

8     instead of me just typing and trying to type word for word

9     what was said.

10         Q.    If it's taped, it's just there; it's preserved.

11    Correct?

12         A.    Correct.

13         Q.    So that if anybody wants to know what happened or

14    what was said, you have an objective record of everything

15    you asked him and everything he told you.  Is that correct?

16         A.    Yes, sir.

17         Q.    You would agree with me that that's the main

18    advantage of tape-recording a statement?

19         A.    Sure.

20         Q.    Now, on the tape, you don't make any -- well, the

21    first thing you do on the tape is kind of make an

22    introduction.  Correct?

23         A.    Yes, sir.

24         Q.    Stating who you are, the date and the time and who

25    you are interviewing.  Correct?

1      A.   Yes, sir.

2      Q.   And when you were doing that, you never asked --

3  said to Jim, hey, Jim, you recall that we went over your

4  rights and that you agreed to waive them?  You didn't do

5  anything like that, correct?

6      A.   No, sir.

7      Q.   Didn't put any reference at all on the taped

8  statement of the fact that you had Mirandized Jim.  Is that

9  correct?

10     A.   That's correct.

11     Q.   And it's not your common practice to tape-record

12  the warnings that you give?  The Miranda warnings.

13     A.   It is now.

14     Q.   It is now?

15     A.   Well, I didn't feel like it was even necessary

16  then, because he wasn't under arrest.  I didn't feel like I

17  had to do the Miranda in the first place, but I did.  So

18  that could have been the reason why I left it out and

19  overlooked it in the recording.

20     Q.   Well, so you didn't think he was under arrest.

21     A.   I know he wasn't under arrest.

22     Q.   Well, to you, is there a distinction to whether or

23  not you're going to arrest somebody and keep them in --

24  locked up overnight and saying to somebody, I need to speak

25  with you, so you're going to come down so I can speak with

1    you, whether I'm going to keep you after we question you or

2    not?  Is there any distinction in your mind between those

3    two things?

4         A.   Is there -- can you please explain --

5         Q.   Yeah.  In your mind is there a distinction between

6    saying, you're under arrest, I'm taking you to the Crawford

7    County Jail and keeping you there, versus I want to talk

8    with you, you need to come and talk with me; once we're done

9    talking, then maybe you'll be able to go?  In your mind, is

10   there a distinction between those two?

11        MR. ERDE:  Objection, Your Honor.  Assuming facts

12   not in evidence.

13        MR. PATTON:  Judge, I'm trying to -- you know, he

14   stated that he didn't think he was under arrest --

15        THE COURT:  I understand.  It's a hypothetical not

16   in evidence.  Sustained.

17        Q.   Did you write up -- you wrote up a report

18   concerning your interview of Jim, correct?

19        A.   Yes, sir.

20        Q.   I'm going to show you -- I'm going to show you

21   Plaintiff's Exhibit 5.  Is that your report?

22        A.   Yes, sir.

23        Q.   You had stated earlier when you were testifying on

24   direct that what you were at Jim's apartment, you told Jim

25   that he wasn't under arrest and he was free to leave.  Is

1    that correct?

2         A.    Yes.

3         Q.    Could you show me where you say that happened in

4    your report.

5         A.    No.

6         Q.    That while you were at the apartment, you gave him

7    that warning?

8         A.    No.

9         Q.    Is it in your report?

10        A.    No.

11        Q.    Why not?

12        A.    Can't tell you.

13        Q.    So you told him while he's standing in his own

14   apartment that he's free to leave at any time?

15        A.    I just told him that he's not under arrest.

16        Q.    So you didn't tell him he was not under arrest and

17   he was free to leave.

18        A.    I wouldn't say he was free to leave there.  I

19   said, you are not under arrest and you'll be free to leave.

20   You will be free to leave.

21        Q.    All right.  Did you or did you not tell him that

22   he was free to leave?

23        A.    Yes.

24        Q.    While he's in his apartment, you tell him he's

25   free to leave?

1          A.    I said, you will be free to leave.

2          Q.    So you told him that he's not under arrest; you

3     will be free to leave.  And when did you tell him that?

4          A.    In his apartment.  As well as the police station.

5          Q.    So in the apartment you told him, you're not under

6     arrest and you will be free to leave.

7          A.    Yes.

8          Q.    But you didn't put that in your report.

9          A.    No, sir.

10          Q.    Now, you did put in your report that you went and

11     you asked to speak with Jim, and he told you that he wanted

12     to go to bed.  Correct?

13          A.    Yes, sir.

14          Q.    And then you told him in your report -- your

15     report states that, in response to that, you told him it was

16     important, and you would be brief.  Correct?

17          A.    Correct.

18          Q.    Because you didn't want to just let him go to bed.

19     Correct?

20          A.    I wanted to talk to him, yes.

21          Q.    Right.  And you wanted him to understand you

22     wanted to talk to him.  Correct?

23          A.    Correct.

24          Q.    Even when he said I want to go to bed and, in your

25     opinion, was trying to avoid you, you wanted him to speak

1    with you.

2         A.    It was a matter that, you know, needed to be taken

3    care of, as far as part of the investigation.

4         Q.    And it was something that needed to be taken care

5    of then.   Correct?

6         A.    That's what I referred, yes.

7         Q.    And that's what you made known to Jim; that, look,

8    this is something that's important, it needs to be done.

9    Correct?

10        A.    Correct.

11        Q.    And that, you know -- it's something that

12   important that needs to be done, needs to be done now.

13   Correct?

14        A.    Correct.

15        Q.    Have you had any other cases where you had someone

16   sign a Miranda waiver form and the form has come up missing?

17        A.    No, sir.

18        Q.    Never had that happen in any other case.

19        A.    No, sir.

20        Q.    Where is the box that you put the form in for the

21   secretary?

22        A.    It's at the dispatch area.

23        Q.    Did you show anybody else the form?

24        A.    Not that I can recall.

25        Q.    Were you ever contacted by the Assistant District

1    Attorney on the case and said, hey, we need to have the

2    Miranda waiver form for discovery?

3        A.    I wasn't contacted, no.  They contact the

4    secretary.

5        Q.    When did you become aware that this form was lost?

6        A.    When notices of this particular hearing started

7    coming up.

8        Q.    So prior to Jim's trial, you had no idea that the

9    form had been lost.

10        A.    Correct.

11        Q.    So nobody talked to you about the fact that it was

12    lost or couldn't be located.

13        A.    Not that I can recall.

14        Q.    Now, Jim had told you that he had been drinking so

15    he didn't feel comfortable in driving down to the station,

16    correct?

17        A.    Correct.

18        Q.    So you knew he had been drinking.  Correct?

19        A.    Yes.

20        Q.    So regardless of what was visible or not visible,

21    you actually knew he had been drinking because he told you

22    that, correct?

23        A.    Correct.

24        Q.    And when you were questioning him, you were

25    questioning him about Lynn and the events that happened over

1    the past weekend.  Is that correct?

2         A.    Yes, sir.

3         Q.    And you said during that, he was sitting back and

4    was acting cocky?

5         A.    Yes, sir.

6         Q.    And was at some points laughing about what was

7    going on, correct?

8         A.    Yes, sir.

9         Q.    Were you trying to be humorous as you were

10   questioning him?

11        A.    Not at all.

12        Q.    You were questioning him about serious criminal

13   allegations, correct?

14        A.    There was -- yes.

15        Q.    I mean, you were asking questions of him regarding

16   whether he had forced Lynn to have sex with him, correct?

17        A.    Correct.

18        Q.    And his response to several of these questions was

19   to chuckle and laugh.  Correct?

20        A.    Yes, sir.

21        Q.    And that didn't cause you to think that perhaps

22   the drinking that he had engaged in and impaired his ability

23   to drive was impairing his ability to understand what was

24   being asked of him?

25        A.    Not at all.

1      Q.    During the interview, you took notes, correct?

2      A.    The recorded interview?

3      Q.    Yes.

4      A.    No, sir.

5      Q.    You didn't write anything down while that was

6   going on.

7      A.    No, sir.

8      Q.    Did you take notes about anything that happened

9   before that interview?

10      A.    Not that I can recall.

11      Q.    When did you write your statement, your report?

12      A.    The supplement?  The 21st of June, '99.

13      Q.    Did you physically type that out yourself, or do

14   you dictate it?

15      A.    I physically type it out.

16      Q.    When in relation -- how long after the questioning

17   did you write that?

18      A.    I don't know, sir.

19      Q.    Is it before or after you put the waiver form that

20   you say Jim executed in the box for the secretary?

21      A.    I would have put the paperwork in the box before

22   and then typed this later.

23      Q.    Now, you've already testified that this has never

24   happened to you before or since.  Is that accurate?  About

25   losing the waiver form.

1    A.   Yes, sir.

2    Q.   As far -- to your knowledge, has this happened in

3  any other case that you're aware of that the Meadville

4  Police Department has investigated?

5         MR. ERDE:  Objection, Your Honor.

6         THE COURT:  Relevance?  Is that what you're

7  saying?

8         MR. ERDE:  Yes.

9         THE COURT:  I understand the point he's making,

10  though I think he's already made it.  But I'll allow him to

11  answer the question, if he knows.

12    A.   We couldn't even find the folder in this case.  It

13  was in the wrong -- it wasn't alphabetically put in right.

14  So --

15    Q.   Well, you eventually found the folder?

16    A.   Yes, sir.

17    Q.   You physically found the folder, and the advice of

18  rights form was not in there?

19    A.   I didn't -- I'm not the one who physically found

20  it.  But it was found.

21    Q.   Okay.  And when was this?

22    A.   Well, this morning.

23    Q.   So the Meadville Police Department still has their

24  file for Jim with regard to the investigation of this case.

25  Correct?

```
 1        A.   Yes, sir.

 2        Q.   And the form is not in the file.

 3        A.   Yes, sir.

 4        Q.   Why not, in the taped statement, get it on tape?

 5   If you're not even going to read the Miranda warnings to him

 6   on the tape, just refer to the fact that, hey, we've gone

 7   over the advice of rights form?

 8             MR. ERDE:  Objection, Your Honor.  Asked and

 9   answered.

10             THE COURT:  Sustained.  I'm not a jury,

11   Mr. Patton.

12             MR. PATTON:  I understand, Your Honor, but --

13             THE COURT:  I'm starting to think it's me.  I

14   mean, do you go over these things with Judge McLaughlin and

15   Judge Cohill?

16             MR. PATTON:  Um-hum.  If you don't, one of the

17   times you won't ask it and --

18             THE COURT:  All right.

19             MR. PATTON:  Those are my questions.

20             THE COURT:  Thank you.  Redirect?

21             MR. ERDE:  Briefly.

22

23

24                    REDIRECT EXAMINATION

25   BY MR. ERDE:
```

1      Q.   When you were at his apartment, his residence, did
2 he ever ask you to leave?
3      A.   No, he did not.
4      Q.   If he had, what would you have done?
5      A.   Left.
6      Q.   He wasn't in custody at that time, then?
7      A.   No.
8      Q.   When he was in the police station, at any point
9 did he ask to leave?
10      A.   No.
11      Q.   If he had, what would you have done?
12      A.   Took him home.
13      Q.   You had indicated to him that you wanted to talk
14 to him briefly?
15      A.   Yes, sir.
16      Q.   Looking at the transcript of the statement, does
17 it indicate when the statement -- when his statement began
18 or when your interview with him began?
19      A.   As far as the date and time?
20      Q.   Yes, sir.
21      A.   Yes.
22      Q.   What time did it begin?
23      A.   11 minutes after 1:00.
24      Q.   And what time did it end?
25      A.   28 minutes after 1:00.

1          MR. ERDE:  I'd ask the Court to take judicial

2    notice that it was a 17-minute interview.

3          THE COURT:  Any objection?

4          MR. PATTON:  No.

5          THE COURT:  The length of the interview at 17

6    minutes is noted.

7    BY MR. ERDE:

8      Q.   And looking at your report, the interview took

9    place, as indicated, on June 21st; is that correct?

10     A.   Yes, sir.

11     Q.   The report you prepared was when?

12     A.   The 21st.

13     Q.   Would it be fair to say your recollection of what

14   happened on June 21st would be better then than today, as to

15   what actually transpired?

16     A.   Certainly.

17     Q.   I think the attorney asked you or said something

18   to the effect that the Miranda waiver form memorializes the

19   consent to provide a statement.  Is the -- what is the

20   purpose of this written police report?

21     A.   That it could help me reflect on for something

22   like this [sic].

23     Q.   You indicated that you -- it was only when these

24   hearing notices started coming about that you learned the

25   Miranda waiver form was missing?

1          A.    Correct.

2          Q.    You make clear reference to the Miranda waiver

3     form in your police report, correct?

4          A.    Yes.

5          Q.    Were you doing that to cover your butt?

6          A.    I didn't feel that I had to.  Just for the simple

7     fact that I explained to him twice that he was not under

8     arrest and was free to leave.  But I still put it in there.

9               MR. ERDE:  Nothing further.

10              MR. PATTON:  Nothing further.

11              THE COURT:  Thank you very much.  Is it Officer

12    or --

13              THE WITNESS:  Officer.

14              THE COURT:  Officer Trenga, thank you very much.

15    You can sit down.  More witnesses?

16              MR. ERDE:  Nothing further from the Commonwealth.

17              THE COURT:  I'm certain that Attorney Patton wants

18    to do a little bit of argument today.  Is there sort of

19    final discussion?  Would you prefer that -- it doesn't

20    really matter to me who goes first, because you'll have the

21    last word anyway, so why don't we have Attorney Erde go

22    first.

23              MR. ERDE:  Thank you, Your Honor.

24              THE COURT:  Neither of you has to go through the

25    habeas requirements.  I'm well versed in those.

1          MR. ERDE:  Your Honor, the question is whether

2     Mr. Hodson was in custody and whether this was an

3     interrogation.  Ultimately those are the issues at hand.

4              And the Commonwealth's position is he wasn't

5     in custody.  He voluntarily agreed to go with the police

6     officer.  Whether or not the first time he said no, Officer

7     Trenga testified it wasn't through strong-arming.  He said,

8     it's important; he said, well, okay, I'll go, and then he

9     went there voluntarily.  The fact that he was in a cruiser

10    does not begin to invoke the notion of custody, and the fact

11    that he had said I shouldn't be driving, so the police

12    officer offered to give him a ride in the cruiser, there's

13    no issue of custody there.

14              Additionally, the question becomes if he

15    reasonably felt like he was in custody.  And the officers

16    had told him at the time they were there, he will be free to

17    leave at any point.  Officer Trenga again testified that at

18    any point you're free to leave when he read him the Miranda

19    warnings.

20         THE COURT:  The fact that he gave the Miranda

21    warnings, any inkling as to whether or not perhaps Officer

22    Trenga thought he was in custody?

23         MR. ERDE:  I don't believe so, Your Honor.  It's

24    the Commonwealth's position that this is standard protocol,

25    procedure when you are getting a statement, regardless of

1    whether or not the individual is in custody.  If they are at

2    the police station, it is pro forma to get this Miranda

3    waiver form, for the individual to be made aware of what

4    rights are afforded to him, whether they are in custody or

5    not.

6              There's been no indication of coercion

7    whatsoever, Your Honor.  There's been no indication that

8    when they went to the residence, he -- he felt pressured to

9    going.  In fact, even though Officer Trenga says he doesn't

10   recall telling him he wasn't under arrest there, the

11   Defendant himself testified that when the police officers

12   got there, they told him, you're not under arrest, you're

13   free to go.

14             Additionally, as far as the intoxication,

15   it's one of those issues that I think is a red herring to

16   the Court.  His recollection is clear as can be as to what

17   actually transpired that evening.  His level of

18   intoxication, whether there was any or not, clearly did not

19   cloud his recollection of what was transpiring.  He was

20   coherent during the interview and he was coherent -- his

21   recollection is clear as to the series and sequence of

22   events.

23             The Commonwealth's burden is a preponderance

24   of evidence that the statement was voluntary, and it's the

25   Commonwealth's position that that is exactly what the Court

1    has heard today.

2                   You heard the statements of Officer Trenga

3    that the Miranda warnings were given.  You heard -- even in

4    the trial transcript, which we didn't get into, but it's

5    part of the record, on Pages 199 to 200 of the trial

6    transcript, officer Trenga says, yes, gave Miranda warnings.

7    You heard from Attorney Prather that he followed up with the

8    officers to make sure that the Miranda was given, and he was

9    assured that it was.

10                   And, again, there's no requirement that the

11   Defendant need know the extent or the scope of what the

12   interview is going to be at the time for the Miranda to be a

13   valid and voluntary waiver.  They wanted to discuss with him

14   that weekend.  That is what they went and they talked to him

15   about.  The fact that he was under the misbelief that they

16   wanted to talk to him about an attempted suicide, rather

17   than a sexual assault scenario, is irrelevant to whether or

18   not the Miranda was voluntary.  It was that weekend that

19   they were talking about.

20                   And while it was his testimony on the stand

21   that his statements saying that he wanted to terminate the

22   conversation had nothing to do with Miranda, his behavior is

23   entirely consistent with someone who was read his Miranda

24   warnings.  He stated, I want to stop talking now.  And after

25   the tape was stopped, he said, I think I want to talk to an

1    attorney.

2              These are part and parcel to what makes

3    Miranda Miranda.  That he was aware of his rights; that he

4    knew he was there voluntarily, that he could stop the

5    conversation at any time.  And that is what we have here.

6              THE COURT:  You know, my recollection of the

7    testimony today is that I think even Attorney Prather

8    testified that the Petitioner complained that he hadn't been

9    given the Miranda rights before they realized that the

10   waiver was missing.  Is that correct?

11             MR. ERDE:  No, Your Honor.  In fact, he has no

12   recollection as to when it was determined --

13             THE COURT:  When he was told by --

14             MR. ERDE:  When he was told, that's correct.

15             THE COURT:  -- the Petitioner.  Because part of

16   what I have to determine is whether or not, of course, his

17   Sixth Amendment right to effective counsel was -- was

18   violated, not just whether or not Miranda rights were given.

19             MR. ERDE:  I understand.  And in the Plaintiff's

20   brief alone, he refers to Thompson versus Cohen, where they

21   discuss the two prongs, and we examine the circumstances

22   surrounding the entire situation.  This was the police come

23   to the residence, ask if he will give a statement, he gets

24   voluntarily into the vehicle, he's never placed in custody,

25   never placed in handcuffs, he was never told he was under

1    arrest, and when he asked to terminate the conversation,

2    terminates the conversation.  And would a reasonable person

3    feel that he or she was free to leave.  That's exactly what

4    happened.  When he said he was done, they took him home.

5                There is no -- as I indicated earlier, there

6    is no showing of coercion, so the question of custody, as

7    well as the question of whether or not there is a

8    suppression issue, while they are intertwined, there was no

9    custody, but even if there were custody, Officer Trenga

10   adamantly testified repeatedly both on direct and on cross,

11   he read him his Miranda, he explained it to him, he read the

12   waiver word for word and observed him sign the waiver form.

13   The fact that it's missing is troubling, but it doesn't

14   negate the fact that he recalls doing it.  It's in the

15   police report.  Even in the Court finds he was in custody,

16   Miranda was, in fact, read to him, that he understood it,

17   and gave a voluntary statement.

18               THE COURT:  I don't have this part of the file in

19   front of me.  It's more likely in Crawford County that a

20   PCRA has a hearing than it is in Erie County.  Do you

21   recall, did this case have a PCRA hearing?

22               MR. ERDE:  Your Honor, that would have been before

23   my time there.

24               THE COURT:  I think it was Judge Miller.

25               MR. ERDE:  There is a PCRA opinion from Judge

1    Miller that is referenced.

2           THE COURT:  We get those in Erie County, but very

3    rarely do we have a hearing.

4           MR. ERDE:  But I don't know if there was an actual

5    hearing.

6           MR. PATTON:  There was not a hearing on the first

7    one.  It was resolved without a hearing.  There was a

8    hearing on the second one.

9           THE COURT:  And the second one was which issue?

10          MR. PATTON:  Judge Miller ruled that some of the

11   claims had already been litigated, including the ineffective

12   assistance of counsel for failure to file a motion to

13   suppress.  It took --

14          THE COURT:  They were litigated in the first PCRA?

15   That's what his ruling was?

16          MR. PATTON:  Yeah.  It got raised on the direct

17   appeal, but got reinstated as a result of the first PCRA.

18   And, therefore, it had already been considered.

19              On the second issue -- the second PCRA

20   hearing, testimony was about Mr. Prather bringing in a prior

21   bad act of -- he had -- Mr. Prather had brought up that on

22   an occasion a couple months before the days that were at

23   issue at the trial, that Miss Devore had said that Jim had

24   raped her in a hospital, actually.  And there was a claim --

25   an ineffective assistance of counsel claim raised for

1    Mr. Prather raising that argument and putting that into

2    evidence, when it would have otherwise been admissible, not

3    asking for a consent instruction.

4          THE COURT:  So those are the things that they had

5    a hearing on?

6          MR. PATTON:  Yeah.  The transcript of that hearing

7    is in the record that got submitted.

8          THE COURT:  Yeah.  Here's the problem with the

9    record that got submitted:  This is one of those cases that

10   was filed before we went on electronic docketing and then

11   switched midstream onto electronic docketing.

12              So you would think, all things being equal,

13   that we could go to the clerk's office and find the paper of

14   the first half of the case, and then go on-line to find the

15   second half of the case.  But, indeed, that hasn't been our

16   experience today.  It's on a disk?  It's been scanned?

17         MR. FOGL:  It was submitted on a disk.

18         THE COURT:  Oh, it was submitted on a disk.

19         MR. FOGL:  They put it on the docketing statement

20   so you can't pull it up and read it on the system.

21         THE COURT:  Oh, I see.  So we have to take the

22   disk and actually put it into the computer.

23         MR. FOGL:  Yes.

24         THE COURT:  I can do that.

25         MR. PATTON:  I can give you a copy of the

1    transcript.

2            THE COURT:  That's okay.  I read -- well, I

3    read -- that's the transcript of the PCRA Hearing No. 2.

4    All right.

5            MR. PATTON:  All right.

6            THE COURT:  I was able to pull up the transcript

7    of the statement and a couple of those things.  I'm sorry.

8            MR. ERDE:  Thank you, Your Honor.

9            THE COURT:  Mr. Patton, please don't tell me the

10    law of in effective assistance of counsel.  I know

11    Strictland.

12            MR. PATTON:  I understand that you know

13    Strictland.  I'm confident that you know that when the

14    ineffectiveness alleged deals with failing to file a motion

15    to suppress, that we have to first prove that it was

16    unreasonable not to file the motion.  Then to prove

17    prejudice, we have to prove that there's a reasonable

18    likelihood that the motion would have been successful and

19    that --

20            THE COURT:  And then eventually that he would have

21    had a different outcome kind of --

22            MR. PATTON:  That's correct.  And there is a --

23            THE COURT:  Which is the toughest part.

24            MR. PATTON:  For us, the middle part --

25            THE COURT:  I think the last part is toughest.

1          MR. PATTON:  I think the last part is a slam dunk.

2          THE COURT:  You do.

3          MR. PATTON:  Sure.  The last part being that had

4    the statement been suppressed, there is a reasonable

5    probability that the outcome at trial would have been

6    different.

7          THE COURT:  Despite his testimony at trial.

8          MR. PATTON:  Well, you have to decide, you know,

9    would he have even had to have testified.  And even if

10   you --

11         THE COURT:  I think his attorney would have put

12   him up.  I think he said that.

13         MR. PATTON:  Look at what he was convicted of and

14   what he was acquitted of.  The only thing -- he's acquitted

15   of the rape.  He's acquitted of the sexual assault.  He's

16   acquitted of the charge of involuntary deviate

17   intercourse --

18         THE COURT:  It's the one thing that's in the

19   statement.

20         MR. PATTON:  Exactly.

21         THE COURT:  I understand.

22         MR. PATTON:  And if you look at Judge Miller's --

23         THE COURT:  You went over that a few times today.

24         MR. PATTON:  Well, I am trying not to be plodding

25   and repetitive, but --

 1          THE COURT:  I'll never live that down.  It was
 2    noon.  I was hungry.
 3          MR. PATTON:  Well, I had it coming.  If you look
 4    at Judge Miller's opinion on the second PCRA petition, and
 5    specifically on Page 4 of it, he's discussing the -- the
 6    strategy that Mr. Prather had of Mr. Prather himself
 7    bringing out the fact that Miss Devore had claimed a couple
 8    months before these events that form the basis of the
 9    charges that Jim had raped her, but that she had never
10    reported it to anyone and that she had continued to see Jim.
11    That was -- that was the argument that Mr. Prather put forth
12    at trial.
13          And defending that decision at the hearing on
14    the second PCRA petition, Mr. Prather explained that
15    basically his trial strategy was to discredit the victim by
16    saying, look, she had made prior claims of rape before
17    and -- but then hadn't followed through with it.  And then
18    arguing that, you know, this idea that she was basically
19    held captive in her own apartment for three days just wasn't
20    a -- wasn't believable.
21          And as Judge Miller -- as Judge Miller put
22    it, he says, quote, "The defense strategy was inter alia to
23    show how ridiculous the victim's testimony was with respect
24    to her fear of the Defendant and to show directly and
25    circumstantially that the victim consented to the weekend of

1   sex."

2           Now, when he gets to -- this is how he ends

3   up at his order on the second PCRA.  The conclusion

4   paragraph.  Says, "The Defendant has not proven to us that

5   trial counsel rendered ineffective assistance of counsel.

6   The jury really saw through most of the Commonwealth's case.

7   Quite simply, the Defendant's testimony that he engaged in

8   cunnilingus with the victim brought this convoluted case

9   down to one very simple issue; whether or not the Defendant

10  did so through the use of forcible compulsion."

11          And the Commonwealth's evidence, the only

12  evidence they had on -- that distinguished the cunnilingus

13  by forcible compulsion to all the other sex charges that he

14  was acquitted of, despite Mr. Prather thinking that Jim

15  didn't do a good job on the stand --

16          THE COURT:  But, see, I don't have his

17  testimony -- I mean, I understand what the only difference

18  is with this statement.  But I don't have that testimony in

19  front of me.  I have not read that yet.  And I will.  But it

20  could be that that's where his testimony was bad as well.

21  Mr. Prather didn't know they were going to acquit him on all

22  those other charges.  Those charges didn't go away before

23  trial.  So the testimony he would have put up would have

24  been the same, wouldn't it?

25          MR. PATTON:  The testimony he put up might have

1    been the same, but the Commonwealth wouldn't have been able

2    to introduce -- had Mr. Prather filed the motion to suppress

3    and had it been successful, the Commonwealth would not have

4    been able to introduce this statement that -- where Jim is

5    saying, in response to Trenga's question, do you think you

6    might have forced her, and Jim says, yeah, in a way.

7              And if you look at the closing argument of

8    the District Attorney, and you read that, his whole -- his

9    closing argument was that statement; was just pounding on

10   that statement.

11             And, indeed, if you look at the opinion of

12   the Superior Court, when they did not -- when they affirmed

13   the denial of the second PCRA, they say that -- this is how

14   they conclude with it, when they are dealing with was

15   Mr. Prather ineffective for talking about the other bad act,

16   being the other rape.  It says, "In addition, appellant was

17   clearly not prejudiced by the accusation of an earlier rape,

18   as he was acquitted of the later rape, as well as two other

19   sex-related crimes.  Indeed, as the Commonwealth points out,

20   he was convicted only of offenses to which he had, in

21   effect, confessed."

22             They got to introduce --

23             THE COURT:  That could mean on the stand or in the

24   statement.

25             MR. PATTON:  He didn't confess --

1          THE COURT:  I have to read the testimony.

2          MR. PATTON:  He didn't confess on the stand.  I

3     assure you, he did not confess while he was on the stand.

4     Read the transcript.

5          THE COURT:  In the first PCRA, was it the opinion

6     that he wasn't in custody?

7          MR. PATTON:  No, the issue was raised in the first

8     PCRA.  But one of the other issues that was raised in that

9     first PCRA was that Mr. Prather had been ineffective by not

10    filing a direct appeal.  And in support of that claim, two

11    letters were submitted to Judge Miller.  One letter was from

12    Jim to Mr. Prather talking about the appeal.  And then the

13    letter that's marked as Plaintiff's Exhibit 1 from

14    Mr. Prather back to Mr. Hodson was also attached.

15             And what Judge Miller said is, you know,

16    normally I'd have to have a hearing to see if somebody had

17    asked their attorney to appeal and the attorney didn't do

18    it.  But he says that -- it says, "We feel that would be a

19    waste of time, because it is rather evident, based upon the

20    exhibits presented at the show cause hearing, that the

21    Defendant, did, in fact, ask counsel to take an appeal, and

22    that no appeal was taken."

23             Now, the show cause hearing was, my

24    understanding, not an evidentiary hearing.

25          THE COURT:  Not an evidentiary hearing.

1          MR. PATTON:  It's just these documents got

2    presented to Judge Miller, Judge Miller looked at it and

3    said, I don't need to take any evidence because it's clear

4    that he asked for an appeal, one wasn't filed, and so he

5    reinstated the appellate rights.

6              And then -- but in the opinion, put in a

7    warning that since he was being -- actually, this is how he

8    ends the opinion.  Says, "We caution the Defendant that

9    since he is now raising ineffective assistance of counsel

10   claims and now that he has new counsel, the ineffectiveness

11   claims must be raised at first opportunity, which will be on

12   the direct appeal we are now permitting the Defendant to

13   pursue."  And the arguments were made to the Superior Court

14   on what was, in effect, the direct appeal.

15         THE COURT:  I have to tell you, from the testimony

16   of Mr. Prather today, I'm not sure that he ever believed

17   that he -- that Mr. Hodson wasn't Mirandized.  I mean, I

18   think from what he said today, it could be argued that the

19   reason he didn't put together a motion to suppress at that

20   point was he just honestly believed that it was a lost

21   paper.  He didn't believe his client.

22         MR. PATTON:  There's some case law on that.  It's

23   not directly on point with the Miranda and the lost

24   paperwork, but --

25         THE COURT:  On investigation?

1          MR. PATTON:  Well, no.  With defense counsel just

2     not filing a motion to suppress when there's no win --

3     there's no downside to filing it, and that there's a very

4     large upside to filing it and winning.

5          THE COURT:  But no one asked him that question;

6     did you believe that he didn't have his Miranda rights.

7          MR. PATTON:  It doesn't matter if he believes it

8     or not.  It is the Commonwealth's burden to prove that a

9     Miranda -- warnings were given and that Miranda rights were

10    knowingly waived.  It doesn't matter if defense counsel

11    100 percent believes that his client got Miranda.  If he

12    doesn't think the Commonwealth can prove that by a

13    preponderance of the evidence, you file the motion.

14              Now, if you don't believe it, it would be

15    unethical to put your client on the stand to testify that --

16    that he didn't receive the Miranda warnings.  If you truly

17    believed that your counsel -- your client would be

18    committing perjury if you put him on the stand to testify

19    that he wasn't Mirandized, then you couldn't put him on the

20    stand.  But it doesn't matter if you think he got them.

21    Because the question isn't was he Mirandized.  The question

22    is can the Commonwealth establish it beyond a reasonable

23    doubt -- by a preponderance of the evidence.  It's the same

24    thing if defense counsel is absolutely 100 percent convinced

25    his client is guilty, that doesn't mean that you don't go to

1   trial.

2          THE COURT:  That's different.  Because in this

3   case, you have Officer Trenga on the stand saying I gave him

4   the Miranda rights.  That's how -- that's how you -- by the

5   preponderance of the evidence --

6          MR. PATTON:  The Commonwealth certainly could have

7   presented that testimony.  And I'm not saying that they

8   couldn't.  Of course, they could put him on the stand to say

9   that.

10          THE COURT:  I mean, knowing that that would

11   happen, I don't think you file a motion to suppress as

12   adamantly as you say it should be.

13          MR. PATTON:  The Seventh Circuit talks about this

14   in Rodriquez versus Young, which is 906 F2d. 1152 --

15          THE COURT:  Why is it never the Third Circuit,

16   Mr. Patton?

17          MR. PATTON:  Well, I have Third Circuit too.

18          THE COURT:  Give me the Third Circuit.

19          MR. PATTON:  Third Circuit is Thomas versus

20   Varner; 428 F3d. 491.

21          THE COURT:  Varner or Barner?

22          MR. PATTON:  Varner, V-A-R-N-E-R.

23          THE COURT:  All right.  And what is that?

24          MR. PATTON:  And in that case, the claim of

25   ineffectiveness was that defense counsel did not file a

1    motion to suppress an in-court identification because there

2    had been an unduly suggestive out-of-court identification.

3    And they talked about whether it was reasonable or not

4    reasonable to file -- actually, the guy had filed a motion

5    to suppress the -- the out-of-court identification, saying

6    it was unduly suggestive, withdrew it when the witness --

7            THE COURT:  Was it a line-up question?

8            MR. PATTON:  Yeah.  Or a show-up or a line-up.

9            THE COURT:  All right.

10           MR. PATTON:  The witness then recanted the

11   identification, so the attorney withdrew the motion to

12   suppress the I.D., but then the witness turned around and --

13           THE COURT:  In court?

14           MR. PATTON:  Yeah, and re-recanted.  And the guy

15   didn't follow up with the motion to suppress, and --

16           THE COURT:  That's different.

17           MR. PATTON:  And what the Third Circuit talks

18   about is that -- because they agreed with the District

19   Court, that failure to move to suppress or otherwise object

20   to an in-court identification by the prosecution's central

21   witness, when there are compelling grounds to do so, is not

22   objectively reasonable representation, absent some informed

23   strategy.  They cite another Third Circuit case, Morrison

24   versus Kimmelman --

25           THE COURT:  That's the key.  Not this there's --

1    the key is the strategy.

2            MR. PATTON:  Well, they then cite cases that talk

3    about that.

4            THE COURT:  Yeah.

5            MR. PATTON:  The Kimmelman case --

6            THE COURT:  That's always the key in these Sixth

7    Amendment cases.

8            MR. PATTON:  Right.  Is there a strategic

9    decision.  But what Kimmelman talks about -- and this is how

10   the Third Circuit summarizes what Kimmelman says, which is

11   another Third Circuit case.  It says, suggesting that proper

12   norms of advocacy required a timely motion to suppress where

13   there was a valid basis for suppression.

14           They also cite to this Rodriquez case from

15   the Seventh Circuit.  And the Seventh Circuit says that --

16   in that case, it was another failure to file a motion to

17   suppress and identification.  They talk about given the

18   crucial nature of -- the identification in that case was a

19   central piece of evidence, and they talk about the fact that

20   there's no downside to filing the motion.  And you would be

21   seeking to suppress evidence that was central to the

22   prosecution's case.  And it says that, "Given the crucial

23   importance of Ramos' testimony and the substantial arguments

24   for its exclusion, that the trial judge should have been

25   asked to rule on its admissibility.  Criminal defense

1   lawyers should not preempt judges by making their own

2   negative rulings on close motions concerning crucial

3   testimony."

4                Now, they have a footnote that says, we're

5   not saying that you have to file a motion if it's frivolous.

6   The footnote says, "We most emphatically do not mean to

7   suggest that in the name of effective assistance, criminal

8   defense lawyers should move to suppress every statement by

9   every witness the prosecution --"

10       THE COURT:  I understand.  I understand that's why

11  you asked him several times whether or not he saw any

12  downside.

13       MR. PATTON:  Well, but this goes on to say, "Only

14  evidence for which there are colorable grounds for exclusion

15  should be targeted.  Frivolous motions should not be

16  brought."

17                But Mr. Prather testified that a motion to

18  suppress in this case would not have been frivolous, and

19  that there were issues about custody and there were issues

20  about whether Miranda rights were given and whether the

21  Commonwealth could prove by a preponderance of the evidence

22  that Miranda warnings were given.

23       THE COURT:  That's why I think the hardest thing

24  is the third prong.  Because I think you get through one and

25  two with that argument.

1          MR. PATTON:  Well, two is that we win the motion
2     to suppress.  And if -- if you win the motion to suppress, I
3     don't understand how --
4          THE COURT:  That's hard to me.
5          MR. PATTON:  I don't understand how you can
6     reasonably say when the only sex charge that Jim gets
7     convicted of is the one that Judge Miller and --
8          THE COURT:  It depends on how he testified to that
9     particular sex charge.  I mean, if he -- I have to read the
10    testimony.  I don't know.  But if he said something similar
11    to what's in that statement, not so much.  Then it could
12    have gone the same way, if that's how he testified on the
13    stand.
14         MR. PATTON:  It could have, but it could not have,
15    because, you know, the Commonwealth doesn't have it in their
16    case in chief.  Jim can testify --
17         THE COURT:  He was going to testify no matter
18    what.  Even if that thing had been suppressed.  I mean, that
19    was clear from Mr. Prather today.
20         MR. PATTON:  Right.  But they don't get to use it
21    just because he testifies, if it's suppressed.
22         THE COURT:  No.  He's allowed to testify about
23    what happened.
24         MR. PATTON:  Right.
25         THE COURT:  And so if he had made the same comment

1  on the stand --

2          MR. PATTON:  Well, you have to read the statement

3  because he doesn't -- but even that, his testimony would

4  have -- when he's testifying and the testimony that you're

5  going to read, he's testifying, and his testimony has to

6  be -- take into account -- you know, give an explanation of

7  what was said in the statement, because the Commonwealth was

8  allowed to use the statement --

9          THE COURT:  That is true.  But there also was a

10  prosecutor who knew about the statement, though the jury

11  didn't, who would have been pushing for some sort of

12  response, knowing that he had given that response prior.

13          MR. PATTON:  Right.  But the prosecution would not

14  be allowed to --

15          THE COURT:  And that's a crack prosecution team

16  down there in Crawford County.  Right, Mr. Erde?

17          MR. ERDE:  Correct, Your Honor.

18          MR. PATTON:  But they are not going to be able to

19  use the statement if it's been suppressed.

20          THE COURT:  They can't use the statement.  But, I

21  mean, they could have pushed harder, knowing that that

22  statement had been given.  They knew that.

23              But, anyway, that's all -- that's part of

24  what happens in habeas.  You have to guess what if.

25          MR. PATTON:  Yes.  But I just -- I just would ask

1    you to read Judge Miller's opinion --

2              THE COURT:  I will.

3         MR. PATTON:  -- denying the second PCRA petition

4    and the Superior Court's.  And the Commonwealth's brief to

5    the Superior Court.  Because they are basically saying, hey,

6    look, there's no in effectiveness.  At that point, the

7    ineffectiveness was focusing on Mr. Prather bringing up this

8    prior rape allegation.  They say, look, it didn't have any

9    impact because they acquitted him on everything except what

10   he confessed to.  And the reference to "confessed to" is the

11   statement, not the testimony at trial.  It's the statement.

12             So, I mean, even Judge Miller and the

13   Superior Court are saying, he went down on the count that he

14   confessed to.  And what we're saying is if you -- if this

15   confession gets suppressed, you have to say -- that has to

16   undermine your confidence in the outcome of the proceedings,

17   which is what we need to show, to show a reasonable

18   probability that the outcome would have been different.

19             THE COURT:  Okay.  You didn't write the brief on

20   this either.  We brought you in for the hearing.  Is that

21   correct?

22        MR. PATTON:  That's correct.

23             THE COURT:  That's why I let you talk about the

24   cases when I said you weren't allowed to.

25        MR. PATTON:  Well, you do what you got to do.

1          THE COURT:  Anything else you want to say?

2          MR. ERDE:  I think he gets the last word, so I'm

3    done.

4          THE COURT:  He usually does, even when he's on the

5    defense side.  Somehow it gets done.

6          MR. PATTON:  Your Honor, can we make it clear to

7    the Department of Corrections that Mr. Hodson is done on the

8    writ to bring him here so that he --

9          THE COURT:  He can be returned.  Where are you

10   being housed?

11         MR. HODSON:  Frankville, Pennsylvania.

12         MR. PATTON:  It's a little northeast of

13   Harrisburg.  Frankville.  But he was -- he's being housed at

14   Albion right now.  But if he gets released from the writ, he

15   will be taken from Albion back to his home institution, and

16   we'd like that to happen as quick as possible.

17         THE COURT:  It might not happen before Christmas.

18   Do you have family back there?

19         MR. HODSON:  No, I have family here, but they are

20   not allowed to visit.

21         MR. PATTON:  So we just want to make sure that the

22   Department of Corrections knows that he's --

23         THE COURT:  He's done with his write.  The writ is

24   just for today, but I don't have to sign anything in

25   particular.

1              MR. PATTON:  Is there anything further you want

2    from us?

3              THE COURT:  No, I don't need any more filings.  I

4    don't need any -- we have everything, now that I realize I

5    can get that on the -- I think we're fine.  I don't need

6    more briefing.  I understand the point.

7                   Thank you very much.  We're adjourned.

8              MR. ERDE:  Thank you, Your Honor.

9

10              (Hearing concluded at 3:36 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25